```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_09/06/2024_
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Tavares Hobbs, Ricardo Bell and Robert
Shaw, on behalf of themselves and all others
similarly situated,

                                    Plaintiffs,

          -against-

Knight-Swift Transportation Holdings, Inc.
et al.,

                                    Defendants.

1:21-cv-01421 (JLR) (SDA)

REPORT AND RECOMMENDATION

STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.

TO THE HONORABLE JENNIFER L. ROCHON, UNITED STATES DISTRICT JUDGE:

Plaintiffs Tavares Hobbs ("Hobbs"), Ricardo Bell ("Bell") and Robert Shaw ("Shaw")
(collectively, "Plaintiffs") bring this putative class action against defendants Knight-Swift
Transportation Holding, Inc. and Swift Transportation Co. of Arizona, LLC (together, "Defendants"
or "Swift"), alleging that Defendants violated the New York Labor Law ("NYLL") by failing to
properly compensate Plaintiffs for off-the-clock work, pay minimum wage, pay overtime
compensation for off-the-clock work, provide spread-of-hours pay and provide accurate itemized
wage statements. (Second Am. Compl. ("SAC"), ECF No. 36, ¶¶ 86-127.)

Pending before the Court is Plaintiffs' renewed motion for class certification, pursuant to
Rule 23 of the Federal Rules of Civil Procedure. (Pls.' 4/8/24 Not. of Mot., ECF No. 125.) For the
reasons set forth below, it is respectfully recommended that Plaintiffs' motion be GRANTED and
that the Court further certify High Value Load Subclasses as set forth herein.

**BACKGROUND**

**I.    The Parties**

Swift is one of the largest trucking companies in the United States. (Am. Answer, ECF No. 56, ¶ 3). Swift operates from three terminals in New York—a facility in Syracuse ("Syracuse Terminal"), a Wal-Mart facility in Johnstown ("Johnstown Terminal") and a Target facility in Amsterdam ("Amsterdam Terminal"). (Damon Decl., ECF No. 134-1, at PDF p. 2 ¶ 4.) In each terminal, Swift employs "Dedicated Drivers," who pick up merchandise and deliver it to retail locations of customers in eight states, including New York. (Damon Decl. ¶¶ 8-9; Williams Decl., ECF No. 134-1, at PDF p. 11 ¶¶ 4, 6; Mullen Decl., ECF No. 134-1, at PDF p. 7 ¶¶ 4, 6; Quast 30(b)(6) Dep., ECF No. 135-4, at 36:3-12; 37:3-19; 43:6-14). At the Syracuse Terminal, Swift also employs Over the Road ("OTR") Drivers, who transport merchandise throughout the country. (Damon Decl. ¶¶ 4, 6; Quast 30(b)(6) Dep. at 8:19-9:6.)

Plaintiff Hobbs was employed by Swift from approximately May 2019 to March 2020, and worked primarily on dedicated accounts for customers Kraft and Sears. (Hobbs Decl., ECF No. 131, ¶ 1.) Plaintiff Bell was employed by Swift from April 2016 to January 2017, primarily as a dedicated driver assigned to the Syracuse Terminal, but operating out of the Amsterdam Terminal. (Bell Decl., ECF No. 130, ¶ 1.) Plaintiff Shaw was employed by Swift for a several month period beginning in March 2017 as a dedicated driver operating out of the Johnstown Terminal. (Shaw Decl., ECF No. 129, ¶ 1.)

**II.    Applicable Safety Regulations And Swift's Pay Policies**

United States Department of Transportation ("DOT") safety regulations require drivers to log their time in one of four DOT duty statuses: (1) "Off duty[;]" (2) "Sleeper berth[;]" (3)

"Driving[;]" or (4) "On-duty not driving[.]" 49 C.F.R. § 395.8(b). Once drivers reach 11 hours of driving or 14 hours in an on-duty status, they are prohibited from driving until they are logged as off duty or sleeper berth for at least 10 consecutive hours. *See* 49 C.F.R. § 395.3(a).[1] Swift drivers use in-cab devices to log their hours of service and duty status. (Quast 30(b)(6) Dep. at 66-69.) Swift does not pay New York drivers for time logged as sleeper berth and also does not pay for time logged as off duty, except in the event of a breakdown or other circumstance that results in "exception" pay. (Quast 30(b)(6) Dep. at 78-79, 91-94.)

### III.    Swift's Operational Policies

Swift's drivers are responsible for delivering freight in a safe and prompt manner while complying with DOT regulations and Swift's policies. (Quast 30(b)(6) Dep. at 94:13-95:3.) Swift's Driver Handbook sets the duties, responsibilities and obligations of its drivers. (*See id*. at 114:25-115:11, 174:10-23; Swift Driver Handbook at 4.)

For "high value loads," the Swift Driver Handbook provides that the driver must remain in the truck and that the driver may not leave the truck unattended for any reason, including being checked into a hotel (the "High Value Load Policy").[2] (*See* Swift Driver Handbook at 91.) Regardless of load value, drivers are not permitted to detach their trucks from loaded trailers unless in a Swift terminal or approved drop yard and are required to obtain written permission from property owners in order to park (the "No Detach/Parking Policy"). (*Id*. at 16, 96.) The Swift Driver Handbook further provides that Swift does not pay drivers for lodging when drivers are on

---

[1] *See also* Swift Driver Handbook, ECF No. 128-4, at 120.

[2] Under Swift's policies, a driver is permitted to leave a high value load out of his sight for short periods to use the facilities where the truck was parked to use a restroom, to shower or to eat. (*See* Swift Driver Handbook at 91.)

the road, unless their truck breaks down, there are no other trucks available, and the repairs take longer than 24 hours (the "Lodging Policy"). (*Id*. at 139.)

Until 2018 (*i.e.*, roughly the first three years of the proposed class period), Swift prohibited drivers from taking their trucks on any "personal conveyance," *i.e.*, using the truck for personal reasons. (Quast 30(b)(6) Dep. at 162-64.) Since 2018, however, Swift has permitted trucks to drive up to 25 miles or for one hour for personal reasons.[3] (*See id*.; Personal Conveyance Policy, ECF No. 136-3, at 1.) The Swift Driver Handbook provides a procedure for drivers to make a "request[] to be home" to their Driver Leaders. (*See* Swift Driver Handbook at 159; *see also id*. at 117 (referring to "Home Requests").) Swift prohibits drivers from having unauthorized passengers or pets in a company vehicle (the "No Passenger/Pet Policy"). (*See* Swift Driver Handbook at 16.) In order to have a passenger on his truck, a driver is required to have an application approved and to have insurance costs deducted from his pay. (*See id*. at 44-45.) Swift also prohibits drivers from possessing any alcohol, including sealed containers, during their tours and from drinking alcohol within 12 hours of being logged as on duty or in their trucks, including their sleeper berths (the "No Alcohol Policy"). (Quast 30(b)(6) Dep. at 142-45.)

## RELEVANT PROCEDURAL HISTORY

On June 13, 2023, the Court denied without prejudice Plaintiffs' first motion for class certification and permitted Plaintiffs to conduct limited discovery on numerosity. *Hobbs v. Knight-Swift Transp. Holdings, Inc*., No. 21-CV-01421 (JLR) (SDA), 2023 WL 3966484, at *1 (S.D.N.Y. June 13, 2023). On August 31, 2023, a Joint Stipulation pertaining to numerosity was

---

[3] Swift's Rule 30(b)(6) witness testified that, between 2018 and 2021, the personal conveyance policy permitted drivers to use their trucks for up to one hour and that the 25-mile limitation was put in place in 2021. (Quast 30(b)(6) Dep. at 163-64.)

"So Ordered" by Judge Rochon, in which the parties "agree[d] that Rule 23(a)(1) [was] satisfied with respect to each of the putative classes defined in the SAC or the [10/7/22] Motion." (8/31/23 Stip. & Order, ECF No. 116, ¶ 1.) Following failed efforts to resolve this case in mediation, due to which the class certification briefing was extended for a period of several months (*see* Joint Ltrs., ECF Nos. 117, 119, 121, 123), Plaintiffs filed their renewed motion for class certification on April 8, 2024. (Pls.' 4/8/24 Not. of Mot.) On April 29, 2024, Defendants filed their memorandum in opposition to class certification (Defs.' Opp., ECF No. 133), and accompanying documents. On May 10, 2024, Plaintiffs filed their reply memorandum. (Pls.' Reply, ECF No. 138.) With the Court's permission, Defendants filed a Sur-Reply on May 28, 2024. (Defs.' Sur-Reply, ECF No. 146.) The Court held oral argument on June 25, 2024. (6/25/24 Oral Arg. Tr. ("6/25/24 Tr. "), ECF No. 147.)

## LEGAL STANDARDS

"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). The party seeking certification first must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), the proposed class must constitute one of the types of classes enumerated in Rule 23(b). Plaintiffs have moved for class certification

under Rule 23(b)(3). Rule 23(b)(3) provides for class certification if the requirements of Rule 23(a) are met and (i) common questions of fact or law predominate over any individual questions [predominance], and (ii) a class action is a superior method of efficiently and fairly adjudicating the matter [superiority]. *See* Fed. R. Civ. P. 23(b)(3). The Second Circuit also has "recognized an implied requirement of ascertainability in Rule 23[.]" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (cleaned up). The party moving for class certification must establish each of the applicable Rule 23 requirements by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). "Two or more classes may be represented in a single action." Fed. R. Civ. P. 23(c)(4) Advisory Comm. Notes to 1966 Amendment. The party seeking certification must establish the requirements as to each class or subclass. *See Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 68 (S.D.N.Y. 2018) ("The same class certification requirements apply to the certification of subclasses: 'a court must assure itself that each subclass independently meets the requirements of Rule 23.'") (quoting *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014)).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. A court may certify a class action only if it concludes, after a "rigorous analysis," that the proposed class meets the requirements of Rule 23(a) and (b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal quotation marks omitted); *see also id*. at 34 ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Secs. Litig*.,

471 F.3d 24, 41 (2d Cir. 2006). The court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id.* The Court has discretion on questions of class certification because "the district court is often in the best position to assess the propriety of the class . . . ." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## **DISCUSSION**

In their renewed motion, Plaintiffs seek to certify three classes and three subclasses, as follows:

Class A: All current and former truck drivers who have been employed by Defendants while being based out of the Walmart Dedicated location in Johnstown, New York and/or the Target Dedicated location in Amsterdam, New York, at any time from February 17, 2015 until the date of class notice.

Subclass 1: all members of Class A who have been away from their assigned base for 24 hours or more after being dispatched on a load assignment, and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York State during such 24-hour period.

Class B: All current and former truck drivers who have been employed by Defendants while being based out of Defendants' Syracuse, New York location, at any time from February 17, 2015 until the date of class notice. Membership in Class B is limited to time logged as "sleeper berth" or "off duty" in New York State.

Subclass 2: all members of Class B who have been away from their assigned base for 24 hours or more after being dispatched on a load assignment, and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York State during such 24-hour period.

Class C: All current and former truck drivers who have been employed by Defendants while being based out of a work location outside of New York State, but who have made at least one pickup and/or delivery in New York State and logged sleeper berth time in New York State, at any time from February 17, 2015 until the date of class notice. Membership in Class C is limited to time logged as "sleeper berth" or "off duty" in New York State.

Subclass 3: all members of Class C who have been away from their assigned base for 24 hours or more after being dispatched on a load assignment,

and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York State during such 24-hour period.

The Classes <u>exclude</u> Drivers who are paid hourly, typically operating a "day cab" truck without a sleeper berth, and who return home every night; as well as "slip seat" Drivers who are assigned short routes that allow them to return home every night.

(Pls.' 4/8/24 Not. of Mot. at 1 (emphasis in original).[4])

Plaintiffs seek certification of the First, Second, Third, Fourth and Fifth Causes of Action of the SAC (failure to pay straight time wages for off-the-clock work, failure to pay minimum wages and failure to pay overtime compensation for off-the-clock, all in violation of NYLL §§ 190 *et seq.* and 650 *et seq.*; failure to provide spread of hours pay in violation of N.Y. Labor Regulation § 142-2.4; and failure to provide accurate wage statements in violation of NYLL § 195), insofar as those causes of action arise from time logged as sleeper berth or off duty that is unpaid or paid at a rate below the applicable minimum wage. (*See* Pls.' 4/8/24 Not. of Mot. at 2; *see also* SAC ¶¶ 86-127.)

## I.    <u>Applicability Of The NYLL</u>

The Court first considers the parties' arguments regarding the applicability of the NYLL, which is an issue that, as Defendants put it, "courses throughout the Rule 23 analysis[.]" (6/25/24 Tr. at 22.) This is not a multistate class action and, thus, does not present an obvious choice of law issue like those courts routinely confront in the context of Rule 23. Rather, Plaintiffs assert claims exclusively under the NYLL and, thus, only can recover to the extent they can establish a

---

[4] Plaintiffs' proposed class definitions supersede the definitions in the SAC. (Pls.' 4/8/24 Not. of Mot. at 2.)

viable claim under that statute.[5] Ultimately, whether Plaintiffs and putative class members can state a claim under the NYLL is a merits determination. However, the extent to which this issue impacts the Rule 23 analysis depends on the applicable legal framework. Plaintiffs' baseline theory, which applies to each of the proposed classes, is that the NYLL at least applies to all hours worked in New York. (*See* Pls.' Mem. at 24.)

For members of Class A, Plaintiffs also contend that the NYLL applies to hours worked outside of New York. Although not meaningfully developed by Plaintiffs, the legal basis for their argument appears to be grounded in a choice-of-law analysis, which, under New York law,[6] looks to which state has the greatest interest in the litigation.[7] (*See* Pls.' Mem. at 3, 5, 23-24; 6/25/24

[5] Plaintiffs made the choice to bring this action under the NYLL and not the federal Fair Labor Standards Act ("FLSA"). As was explained by Plaintiffs' counsel at oral argument, Plaintiffs are former members of a collective that brought claims under the FLSA "on a similar legal theory" on behalf of trainee drivers. (6/25/24 Tr. at 21.) According to Plaintiffs' counsel, this case was brought to "enforce the New York State law protections after there was this federal case that was brought to address the violations on a federal level." (*Id*. at 22.)

[6] In diversity actions such as this one, the Court applies New York's choice-of-law rules to determine which state's substantive law to apply. *See Bierer v. Glaze, Inc.*, No. 05-CV-02459 (CPS), 2006 WL 2882569, at *8 (E.D.N.Y. Oct. 6, 2006) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). According to New York choice-of-law rules, the law of the jurisdiction with the most significant contacts and the greatest interest in the litigation will be applied. *See id*. (citing *Index Fund, Inc. v. Ins. Co. of North America*, 580 F.2d 1158 (2d Cir. 1978)).

[7] Some courts have suggested that a choice-of-law analysis is appropriate to determining the state law to apply to wage and hour claims by employees, like Plaintiffs, who, in the course of their work, regularly cross state lines. *See Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*, No. 13-CV-06789 (CBA) (LB), 2015 WL 5567073, at *9 (E.D.N.Y. Sept. 21, 2015) (citing *Padula v. Lilam Props. Corp.*, 84 N.Y.2d 519, 620 (1994)); *Kim v. Fam. Bob Inc.*, No. 20-CV-00906 (ENV), 2021 WL 7906544, at *5 (E.D.N.Y. Jan. 26, 2021) ("Claims arising under the NYLL concern conduct regulation and, where the work occurs in more than one state, a New York choice-of-law analysis is appropriate to determine whether New York is the jurisdiction with the greater interest in the dispute, such that New York law applies.") (citing *Padula*); *Pierre v. Gts Holdings, Inc.*, No. 15-CV-00143 (PAC), 2015 WL 7736552, at *3-4 (S.D.N.Y. Nov. 30, 2015) (applying interest analysis to wage-and-hour claims for chauffeur who worked in both New York and New Jersey). Other courts have cast doubt on a choice of law analysis because of the lack of extraterritorial reach of state statutes, but those cases involved claims where the work at issue was entirely performed outside of the state. *See Warman v. Am. Nat'l Standards Inst.*, No. 15-CV-05486 (RA), 2016 WL 3676681, at *2 (S.D.N.Y. July 6, 2016); *see also In re Stage Presence Inc.*, 559 B.R. 93, 100 (Bankr. S.D.N.Y. 2016), *aff'd*, No. 12-10525 (MEW), 2019

Tr. at 12-19). For drivers in Class A, Plaintiffs suggest that New York has a greater interest in applying its wage and hour laws than any other state where those drivers performed work because putative class members were based out of locations in New York and primarily worked in New York. (Pls.' Mem. at 3, 5-6; Pls.' Reply at 9-10.) Plaintiffs further contend that this issue can be decided on a classwide basis. (Pls.' Mem. at 24 (citing *Kloppel v. HomeDeliveryLink, Inc.*, No. 17-CV-06296 (FPG), 2020 WL 2897014, at *8 (W.D.N.Y. June 3, 2020) ("[T]he NYLL will either apply to all of the deliveries the [] drivers made or only those deliveries they made in New York.").) For Classes B and C, Plaintiffs argue that there is no choice of law issue because they only are seeking to recover for work performed within New York. (Pls.' Reply at 10.)

Defendants urge the Court to deny Plaintiffs' motion on choice of law grounds. (Defs.' Opp. at 22-25.) With respect to Class A and Subclass 1, Defendants argue that application of the NYLL requires an assessment of each driver's contacts with New York and, thus, cannot be determined on a classwide basis. (*Id*. at 24.) However, if the Court finds that a choice of law interest analysis is appropriate for Class A, this argument properly is considered as part of the predominance inquiry. (*See* Discussion Section III.A., *infra*.) With respect to Classes B and C, and their respective subclasses, Defendants argue that Plaintiffs have not fully explained the legal framework behind their theory that the NYLL can "toggle 'on and off'" to apply only to certain hours and, thus, have not met their burden to offer a sufficient choice of law analysis. (*Id*. at 25; *see also* Defs.' Sur-Reply

---

WL 2004030 (S.D.N.Y. May 7, 2019) ("An 'interest analysis' cannot be used to give extraterritorial effect to a statute when the legislature did not provide that the statute would have such effect."). Still other courts have taken a slightly different approach. *See Hernandez v. NJK Contractors, Inc.*, No. 09-CV-04812 (RER), 2015 WL 1966355, at *42 (E.D.N.Y. May 1, 2015) (applying NYLL to compensable time spent traveling in New Jersey when such travel was "incident to [the plaintiffs'] labor performed in New York"); *see also Solouk v. Eur. Copper Specialties, Inc.*, No. 14-CV-08954 (DF), 2019 WL 2181910, at *17 (S.D.N.Y. May 2, 2019) (citing *Hernandez*, 2015 WL 1966355).

at 7.) The Court disagrees. Because Plaintiffs have limited their claims to time spent working in New York, no choice of law analysis is required. Defendants seem to suggest that, instead, the Court should apply a choice of law analysis for each driver to determine which single state has the greatest interest in his or her wage and hour claims. (*See* Defs.' Opp. at 25.) However, if Plaintiffs in Classes B and C wish to limit their claims to time spent working in New York, as opposed to seeking possibly broader recovery elsewhere, the Court finds no reason why they cannot do so.[8]

The Court notes, however, that there appear to be several inconsistencies in Plaintiffs' proposed class definitions with regard to Plaintiffs' framework as to the applicability of the NYLL. First, Plaintiffs suggest that drivers in Class A can recover for all hours logged as sleeper berth or off duty under the NYLL because they are based out of locations in New York and primarily work in New York. (Pls.' Mem. at 3.) However, that also may be true for some putative class members in Class B. (*See* Damon Decl. ¶¶ 5, 8 (referring to dedicated drivers based out of the Syracuse Terminal).) Moreover, it may not be true for all putative class members in Class A, as being based out of the Johnstown Terminal or Amsterdam Terminal is an imperfect proxy for the amount of time a driver spent working in New York. (*See* 6/25/24 Tr. at 23-28; *but see id*. at 110-11; *see also* Mullen Decl. ¶ 8; Williams Decl. ¶ 9.) Second, if putative class members can assert claims under the NYLL for any hours logged as sleeper berth or off duty in New York, it is not clear why Plaintiffs

---

[8] Although Defendants argue that it is Plaintiffs' burden to offer a sufficient choice of law analysis in moving for class certification to support their theory that the NYLL applies to all hours worked in New York (Defs.' Opp. at 25), as set forth above, the Court agrees with Plaintiffs that there is no choice of law issue for Classes B and C. To the extent Defendants are arguing that Plaintiffs in Classes B and C cannot state a claim under the NYLL, that is a merits issue that is not properly before the Court. In any event, Defendants have not pointed to any legal authority to support the view that the NYLL cannot apply to hours worked in New York even if a putative class member also worked, or even primarily worked, in other states.

created separate classes based on whether a driver was based out of the Syracuse Terminal or based outside of the state (*i.e.* Classes B and C). Thus, in the Court's view, Plaintiffs' proposed classes do not align with the framework through which they suggest that the NYLL will apply.

In light of the foregoing, the Court has considered whether to modify the proposed class definitions.[9] However, the Court finds that the inconsistencies in Plaintiffs' proposed class definitions do not undermine class certification and, therefore, any modifications to address these apparent inconsistencies are best addressed following further development of the record. *See M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 231-32 (S.D.N.Y. 2016) ("[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." (internal quotation marks & citation omitted)); *see also Nayani v. LifeStance Health Grp., Inc.*, No. 22-CV-06833 (JSR), 2023 WL 6311475, at *5 (S.D.N.Y. Sept. 28, 2023) (basing class certification decision on "current, still developing, record" and noting that "judge remains free to modify [class certification order] in light of subsequent developments in the litigation" (quoting *M.G.*, 162 F. Supp. 3d at 231-32). Thus, the Court now turns to the elements of Rule 23.

---

[9] "It is well-established that '[t]he court may, in its discretion . . . modify the definition of the proposed class to provide the necessary precision or to correct other deficiencies." *Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254, 267 (E.D.N.Y. 2016). "In fact, the court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the necessary precision." *Id*. (quoting *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 114 (E.D.N.Y. 2011)); *see also Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."); 7A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1759 (4th ed.) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23.").

## II.    Requirements of Rule 23(a)

### A.    Numerosity

For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable. Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible," and "[c]ourts have not required evidence of exact class size or identity of class members." *Robidoux*, 987 F.2d at 935. In the Second Circuit, numerosity is presumed when a class consists of forty members or more. *See Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 252 (2d Cir. 2011) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Swift has stipulated that there are more than 40 drivers in each of Plaintiffs' proposed classes and subclasses. (*See* 8/31/23 Stip. & Order ¶¶ 1-3.) Accordingly, the Court finds that the numerosity requirement is satisfied for each of Plaintiffs' proposed classes and subclasses.

### B.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." A question is common to the class if it is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Commonality therefore "turns on the ability of the action to generate common answers apt to drive the resolution of the litigation." *Elisa W. v. City of New York*, 82 F.4th 115, 123 (2d Cir. 2023) (quoting *Wal-Mart*, 564 U.S. at 350). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (internal quotation marks omitted). Commonality under Rule 23(a)(2)

"is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-CV-08144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009) (cleaned up). A single common question of fact or law suffices to satisfy this element. *See Wal-Mart*, 564 U.S. at 359. Moreover, claims of individual class members need not be identical. *See Johnson*, 780 F.3d at 137. All that is required is that there are "issues whose resolution will affect all or a significant number of" the class. *Id.*

### 1.    Classes A, B And C

Plaintiffs contend that there are common questions regarding whether Swift's policies rendered time logged as sleeper berth or off duty primarily for Swift's benefit, such that those hours were compensable under the NYLL, and that common evidence regarding those policies will drive resolution of the litigation for all class members. (Pls.' Mem. at 1, 13-15.)

"The NYLL 'incorporate[s] FLSA standards for determining whether time worked is compensable time.'" *Perkins v. Bronx Lebanon Hosp. C6/25/24 Tr.*, No. 14-CV-01681 (JCF), 2016 WL 6462117, at *4 n.6 (S.D.N.Y. Oct. 31, 2016) (quoting *Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 393 (N.D.N.Y. 2011)), *aff'd*, 715 F. App'x 103 (2d Cir. 2018)). "Though Congress has never explicitly defined what constitutes work under the FLSA, the Supreme Court has generally described work as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'" *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (citing *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008).

"However, exertion is not necessarily required for an activity to be compensable because 'an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.'" *Singh*, 524 F.3d at 367 (citing *Armour & Co. v. Wantock,* 323 U.S. 126, 133 (1944)). "The issue is whether the time is spent predominantly for the employer's benefit or for the employee's[,] which is a question dependent upon all the circumstances of the case." *Id.* (cleaned up). Periods of inactivity may be compensable if they are "unpredictable" and "of short duration" such that the employee "is unable to use the time effectively for his own purposes." *Pichardo v. Hoyt Transp. Corp.*, No. 17-CV-03196 (DLI), 2018 WL 2074160, at *5 (E.D.N.Y. Jan. 31, 2018); *see also Lassen v. Hoyt Livery, Inc.*, 120 F. Supp. 3d 165, 176 (D. Conn. 2015) ("The relevant inquiry is not whether plaintiffs' duties prevented them from engaging in any and all personal activities during waiting time; rather it is whether the time is spent predominantly for the employer's benefit or the employee's.") (granting plaintiff's motion for summary judgment). "[T]he question of 'whose benefit predominated' is a binary inquiry[.]" *Lassen*, 120 F. Supp. 3d at 176 (quoting *Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1135 (10th Cir. 2000)).

Defendants argue that the existence of common policies alone does not satisfy commonality because Plaintiffs have not offered evidence as to how these policies transformed hours logged as sleeper berth or off duty into compensable time. (Defs.' Opp. at 12-15.) Defendants cite to testimony of drivers that they contend undermines Plaintiffs' theory that the policies at issue prevented drivers from using the time for their own purposes and predominately benefited Swift. (*See id*.) The Court finds that Defendants' argument regarding the application of Swift's policies is best addressed as part of the predominance inquiry. (*See* Discussion Section III.A., *infra*.) For purposes of commonality, there are at least some common questions regarding

Swift's policies that are subject to common proof. (*See* Pls.' Reply at 1.) For example, each putative class member will need to introduce evidence to establish each policy relevant to the issue of compensability.

However, with respect to the specific set of policies each putative class member will rely upon to establish that time logged as sleeper berth and off duty primarily was for Swift's benefit, there is one policy that does not apply to all class members: the High Value Load Policy. (*See* 6/25/24 Tr. at 34 (Plaintiffs' counsel acknowledging that the High Value Load Policy only applied when drivers were carrying high value loads).) Thus, although Plaintiffs' primary legal theory is that the collective impact of Swift's policies rendered all time logged as sleeper berth or off duty compensable,[10] Plaintiffs, in fact, are asserting two alternative theories of compensability — one based on the collective set of policies other than the High Value Load Policy that apply to *all* hours logged as sleeper berth and off duty and one based on those policies plus the High Value Load Policy, which applies only when a driver is carrying a high-value load. (*See id.* at 70-73.)

As Plaintiffs acknowledged during oral argument, "the Court is empowered to refine the class definition if there are policies that the Court identifies as particularly onerous or that might subject drivers to greater control." (6/25/24 Tr. at 39.) "Under Rule 23(c), a court may divide a class into subclasses when all members of the class challenge the same conduct by a defendant but [assert] varying specific interests and legal theories." *Baker v. Saint-Gobain Performance Plastics Corp.*, 632 F. Supp. 3d 19, 54-55 (N.D.N.Y. 2022) (quoting *Hamelin*, 274 F.R.D. at 393); *see*

---

[10] *See* Pls.' Mem. at 13 ("Swift's set of uniform policies that collectively restrict the Drivers' freedom of movement and activity will drive resolution of the central liability determination under the applicable standards . . . ."; *see also* 6/25/24 Tr. at 89 ("The contention is not that, hey, look, this policy standing alone gives rise to control. It is that the policies, when considered in their totality, give rise to control.").

*also Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 45 (E.D.N.Y. 2008) ("[E]ven if some portion of the class may have some non-common factual issues . . . [t]he Court has at its disposal procedur[al] mechanisms, such as the creation of a subclass, to address such a situation should it arise.").[11]

The Court finds that additional subclasses are warranted here. The course of events in *Bouissey*, a case cited extensively by both sides, is instructive. *Bouissey v. Swift Transp. Co.*, No. 19-CV-03203 (VAP) (KKX), 2022 WL 16957830 (C.D. Cal. Sept. 27, 2022) ("*Bouissey I*"). The plaintiffs in *Bouissey*, represented by the same plaintiffs' counsel as here, argued that a similar set of Swift's operational policies subjected drivers to sufficient control such that all hours logged as sleeper berth or off duty were compensable under California law.[12] *See Bouissey I*, 2022 WL 16957830, at *7. Those plaintiffs also argued, in the alternative, that Swift's High Value Load Policy (as well as a high theft area policy not at issue here (*see* 6/25/24 Tr. at 42)) "impose[d] sufficient control requiring compensation for off duty or sleeper berth time when drivers are transporting high-value loads or are transiting high-theft areas." *Bouissey I,* 2022 WL 16957830, at *7.

---

[11] Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "The process of isolating the issues appropriate for representative treatment and dividing the class into suitable units may be undertaken at any time." 7AA Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1790, Partial Class Actions and Subclasses (3d ed.). Thus, Rule 23(c)(4) "best may be used to designate appropriate classes or class issues at the certification stage . . . [so that] the court can determine whether, as so designated, the other Rule 23 requirements are satisfied." *Id*. The Court uses Rule 23(c)(4) in this manner here.

[12] "[W]hether an employee deserves pay in California turns on whether the employer exercised control over the employee." *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1077 (9th Cir. 2020). As set forth above, New York law articulates the standard somewhat differently.

The *Bouissey* court found that the determination of the legality of Swift's High Value Load Policy and high theft area policy would drive the resolution of the litigation with respect to the proposed class. *See Bouissey I,* 2022 WL 16957830, at *5. In the Court's view, that finding was in error because, as the court later acknowledged, the High Value Load Policy and high theft area policy did not apply to all class members. *See id.* at *8 (discussing predominance). Nonetheless, the *Bouissey* court was satisfied, based upon statements by Swift in the record before it at the time, that the proposed class was not overinclusive of drivers unaffected by those policies. *Id.* Thus, the *Bouissey* court declined to consider a subclass and certified a single class despite the fact that the plaintiffs' alternative legal theory did not apply to all class members. *See id.*

The problem with this approach became clear later, when after finding as a matter of law that only the High Value Load Policy and high theft area policy exerted a sufficient level of control over drivers to render sleeper berth or off duty time subject to those policies compensable under California law,[13] the *Bouissey* court found itself with a class and class representatives ill-suited to this narrower claim. The *Bouissey* court ultimately decertified the class, finding, among other deficiencies, that the named plaintiffs failed to satisfy the typicality requirement for the high value load class because they never carried high value loads. *See Bouissey v. Swift Transp. Co.*, No. 19-CV-03203 (VAP) (KKX), 2024 WL 649246, at *4 (C.D. Cal. Jan. 30, 2024) ("*Bouissey III*").

With the benefit of this example, the Court recommends creation of a second set of subclasses for Classes A, B and C that are limited to drivers who carried high value loads. The

---

[13] *See Bouissey v. Swift Transp. Co.*, No. 19-CV-03203 (VAP) (KKX), 2023 WL 3400620, at **6-9 (C.D. Cal. Apr. 5, 2023) ("*Bouissey II*") (granting in part and denying in part Swift's motion for summary judgment).

Court refers to these subclasses as the "HVL Subclasses."[14] Commonality easily is satisfied once these subclasses are added. Putative class members for the main classes will introduce common evidence of the set of Swift's policies (*e.g.*, the Lodging Policy, No Detach/Parking Policy, the Personal Conveyance Policy, the No Passenger/Pet Policy and the No Alcohol Policy) that they contend collectively rendered all time logged as sleeper berth or off duty primarily for Swift's benefit. (*See* note 10, *supra*.) Members of the HVL Subclasses will submit additional evidence, common to those classes, regarding Swift's High Value Load Policy.

### 2.    Subclasses 1, 2 And 3

Plaintiffs' alternative theory of liability, which is the basis for Plaintiffs' proposed subclasses (Subclasses 1 through 3), is that Swift's policy of not paying for any time logged as sleeper berth is unlawful based on United States Department of Labor regulation 29 C.F.R. § 785.22.[15] (*See* Pls.' Mem. at 4, 15-18.) Plaintiffs argue that, pursuant to that regulation, they

---

[14] Returning to Rule 23(a)(1) (*i.e.*, numerosity), Swift has stipulated that "from February 17, 2015 until the date of [the] stipulation, there are more than 40 individuals who have been assigned to [Swift's] Walmart Dedicated location in Johnstown, New York and/or the Target Dedicated location in Amsterdam, New York, and who have carried a load designated by [Swift] as 'high value.'" (8/31/23 Stip. & Order ¶ 4; *see also* 6/25/24 Tr. at 101 ("[Swift] stipulated that certainly there are enough dedicated drivers that carried an HVL."). Thus, numerosity is satisfied for the HVL Subclass for Class A. The Stipulation also contemplates that "[s]hould the Court recommend certifying or conditionally certifying a class(es) or subclass(es) other than those defined in the SAC (ECF No. 36) or the Motion (ECF No. 71), the Parties shall undertake discovery as to any such class(es) or subclass(es) so certified to allow the Court to determine whether numerosity under Rule 23(a)(1) is met consistent with the Court's ability to revisit a class certification order pursuant to Rule 23(c)(1)(C)." (8/31/23 Stip. & Order ¶ 5.) Thus, the Court recommends certifying HVL Subclasses subject to a further submission by the parties regarding numerosity of the HVL Subclasses for Classes B and C.

[15] The regulation provides, in relevant part, that "[w]here an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked[.]" 29 C.F.R. § 785.22(a). "Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked." *Id.*

should have been paid at least for time logged as sleeper berth in excess of eight hours for any 24-hour period and, possibly, all sleeper berth time. (*Id*. at 17-18 (arguing that all sleeper berth time is compensable under this theory unless Defendants establish an affirmative defense); *but see* 6/25/24 Tr. at 43 (Plaintiffs' counsel stating that "[t]he argument is that sleeper berth time in excess of eight hours per 24-hour period is compensable.").) Defendants argue that Plaintiffs have not shown that § 785.22 applies and, moreover, that Plaintiffs' argument presupposes that drivers are engaged in compensable work 24 hours a day, which Plaintiffs first would have to establish. (Defs.' Opp. at 16-17.)

The Court finds that the applicability (or inapplicability) of § 785.22 is a common question subject to common proof. *See Hobbs v. Knight-Swift Transp. Holdings, Inc.*, No. 21-CV-01421 (JLR) (SDA), 2023 WL 3620885, at *12 (S.D.N.Y. Feb. 9, 2023), *report and recommendation adopted as modified*, 2023 WL 3966484 (S.D.N.Y. June 13, 2023) ("whether Swift's uniform policy of not paying for sleeper berth time violates the federal standards that set the floor for state law presents a common question of law.") (citing *Bouissey I*, 2022 WL 16957830, at *6 (applicability of § 785.22 presented common question of law)). Thus, commonality is satisfied with respect to Subclasses 1 through 3.

### C.    **Typicality**

Rule 23(a)(3) requires that the class representatives have claims typical of those shared by the class members. Fed. R. Civ. P. 23(a)(3). "To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting

*Robidoux*, 987 F.2d at 936). However, "the typicality criterion does not require that the factual predicate of each claim be identical to that of all class members." *MacNamara v. City of New York*, 275 F.R.D. 125, 138 (S.D.N.Y. 2011) (internal citations, quotation marks & emphasis omitted). "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 441 (S.D.N.Y. 2023) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)); *see also Metcalf v. TransPerfect Translations Int'l Inc.*, No. 19-CV-10104 (ER) (KHP), 2023 WL 9510777, at *7 (S.D.N.Y. Nov. 6, 2023) ("The typicality requirement is 'not demanding.'" (*quoting In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. July 27, 2007)), *report and recommendation adopted*, 2024 WL 1208975 (S.D.N.Y. Mar. 21, 2024).

Plaintiffs meet the typicality requirement. Plaintiffs' claims, like those of the proposed class members, stem from the same alleged common policies and there is evidence in the record that each of the named Plaintiffs were affected by the relevant policies, including the High Value Load Policy. (*See* Hobbs Decl. ¶¶ 7, 10-11, 15-17; Shaw Decl. ¶¶ 12, 15-16, 18-21; Bell Decl. ¶¶ 12, 13, 16-18, 21.) Plaintiffs also will also make similar arguments to prove liability. In addition, at least one named plaintiff is typical for Classes A, B and C based on the locations where they were based. (*See* Hobbs Decl. ¶ 3; Shaw Decl. ¶ 3; Bell Decl. ¶ 1 .) Defendants argue that none of the named Plaintiffs are members of Class C (Defs.' Opp. at 18-19; 6/25/24 Tr. at 105), but Plaintiffs have pointed to testimony that Hobbs was based out of Fairless Hills, Pennsylvania, which the Court finds sufficient to meet the typicality requirement for Class C. (*See* 6/25/24 Tr. at 16, 112-13.)

The named Plaintiffs' claims also are typical of the claims for Subclasses 1 through 3 since each of the named Plaintiffs were away from their assigned base for 24 hours or more after being dispatched on a load assignment, and logged at least some "sleeper berth" or "off duty" time. (*See* Hobbs Decl. ¶¶ 5-6, 19; Shaw Decl. ¶¶ 7-8, 24; Bell Decl. ¶¶ 6, 18, 21.) Accordingly, the Court finds that the named Plaintiffs' claims are typical for each of the classes and subclasses.

### D.    <u>Adequacy Of Representation</u>

The fourth element of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). For class representatives, "[a]dequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). In addition, courts in this Circuit consider whether "plaintiff's attorneys are qualified, experienced and able to conduct the litigation" in assessing adequacy under Rule 23(a)(4). *In re Flag Telecom*, 574 F.3d at 35 (citing *Baffa*, 222 F.3d at 60).

There is no dispute that the named Plaintiffs have an interest in vigorously pursuing the claims of the class, and have no interests antagonistic to the interests of other class members. (*See* Hobbs Decl. ¶¶ 20-22; Bell Decl. at pp. 8-9;[16] Shaw Decl. ¶¶ 21-23.) In addition, the Court finds that Plaintiffs' counsel are qualified, experienced and able to conduct this litigation. (*See* McNerney Decl., ECF No. 127, ¶¶ 3-11; Piller Decl., ECF No. 128, ¶¶ 2-7.) Plaintiffs' counsel have

---

[16] The paragraphs in the Bell Declaration are misnumbered such that after ¶ 23 the next two paragraphs are numbered ¶ 21 and ¶ 23 but should be ¶ 24 and ¶ 25. Thus, the Court cites to the relevant page numbers for this portion of the declaration.

significant experience in similar litigation, including many cases similar to this one. (McNerney Decl. ¶¶ 4-7, 10; Pillar Decl. ¶¶ 2-7.) Plaintiffs' counsels' knowledge and experience are evident from their zealous advocacy in this litigation to date and Defendants do not contest their adequacy. Accordingly, the Court finds that they are adequate to represent the proposed class.

        **E.**    **Ascertainability**

The law in this Circuit is clear that "[t]he ascertainability doctrine . . . requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras*, 862 F.3d at 264. "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id*. at 269. Thus, "'the ascertainability analysis is limited to [the] narrower question' of whether class membership is 'objectively *possible*,' not whether it is practical or administratively feasible." *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF) (SN), 2018 WL 739580, at *7 (S.D.N.Y. Jan. 10, 2018) (emphasis in original) (quoting *In re Petrobras*, 862 F.3d at 270). "As a result, the standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548 (S.D.N.Y. 2021) (cleaned up).

The Court finds that the proposed classes and both sets of subclasses are defined by objective criteria such that the ascertainably requirement has been satisfied. Defendants initially argued that Plaintiffs could not ascertain membership because they did not seek the requisite data from Swift's AS400 database and because, at least since June 2021, DOT logs for that period only exist in individual PDF documents such that a "herculean manual review" would be required. (Defs.' Opp. at 10-11.) However, during oral argument, Defendants appeared to concede that,

whether or not Plaintiffs have already sought data from the AS400 database, the issue is whether objective criteria exist, not whether Plaintiffs have established class membership at this juncture. (*See* 6/25/24 Tr. at 77.) Defendants' argument that a "herculean" effort would be required to identify class members also does not mean that the classes are not ascertainable. (Defs.' Opp. at 10-11.) The primary case relied upon by Defendants, *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 440 (E.D.N.Y. 2021), found that ascertainability was not met when time-intensive inquiries regarding the causes of car accidents would be necessary to determine membership and there were numerous subjective criteria for membership. *See id.* Similar concerns are not present here. Moreover, as discussed during oral argument, it appears that no manual review would be required in this case in any event. (*See* 6/25/24 Tr. at 81 (discussing availability of electronic data that includes relevant information).)

Finally, Defendants argued that Plaintiffs' class definitions compromised ascertainability because Plaintiffs could not identify those drivers who slept at home and, therefore, were excluded from the class. (Defs.' Opp. at 11.) However, as Plaintiffs explained during oral argument, these drivers can be identified because they would not have logged any time as sleeper berth. (6/25/24 Tr. at 76-77.) Accordingly, the Court finds that the proposed classes and subclasses meet the modest threshold for ascertainability.

## III.    **Requirements of Rule 23(b)**

### A.    **Predominance**

Under Rule 23(b)(3), the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Rule 23(b)(3) predominance requirement overlaps considerably with Rule 23(a)(2)'s commonality requirement, although the predominance requirement is "far more demanding." *Id.* at 624; *see also Allen v. City of New York*, No. 19-CV-03786 (JMF), 2022 WL 4133132, at *2 (S.D.N.Y. Sept. 12, 2022) (citing *Amchem*, 521 U.S. at 623).

"The predominance inquiry 'begins . . . with the elements of the underlying cause of action.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 44 (S.D.N.Y. 2020) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2001)). "[A] court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson*, 780 F.3d at 138 (quoting *McLaughlin on Class Actions* § 5:23 (20th ed.)).

"[P]redominance is a comparative standard[.]" *In re Petrobras*, 862 F.3d at 268. Courts must "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "To that end, a complete assessment of predominance demands that a district court 'consider *all* factual or legal issues' and classify them as subject either to common or individual proof." *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022) (emphasis in original) (footnote omitted). "An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof." *Petrobras*, 862 F.3d at 270 (quoting *Tyson Foods*, 577 U.S. at 453). "The

predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (cleaned up); *see also In re Petrobras*, 862 F.3d at 270. This analysis is more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *Id*. at 271 (cleaned up); *see also Haley*, 54 F.4th at 121 ("Predominance is not simply an exercise in tallying up issues[.]").

### 1.    Applicability Of The NYLL

As set forth above, the Court may need to conduct a choice-of-law analysis to determine whether members of Class A can recover for hours worked outside of New York.[17] Plaintiffs argue that this issue can be resolved for all members of Class A using common proof because the inquiry will be the same for all drivers based out of the Johnstown Terminal or the Amsterdam Terminal. If Plaintiffs prevail on their theory that being based out of one of those two terminals alone is a sufficient to satisfy the greater interest test, the Court agrees that common evidence, presumably a list of drivers based out of those facilities during the class period, would suffice. If, however, Plaintiffs also are required to introduce evidence as to where each putative class member actually worked, that determination would require individual proof, such as each driver's DOT logs. Nevertheless, the Court is satisfied that, even if some individual proof is required to show that the NYLL applies to all hours worked by drivers in Class A, individual inquiries will not predominate over common ones. The key issue in this case is whether time logged as sleeper berth or off duty is compensable. As discussed below, that issue is susceptible to classwide proof and the Court

---

[17] If, however, the Court determines that the NYLL applies only to hours worked in New York, no choice of law inquiry would be required and, thus, there would be no issue for consideration in the predominance analysis.

finds that it is more significant than any individual inquiry that would be required based upon choice of law.

### 2.    Compensability Of Hours Logged As Sleeper Berth Or Off Duty

As set forth above, Plaintiffs seek certification of their claims for failure to pay straight time wages for off-the-clock work, failure to pay minimum wages, failure to pay overtime compensation for off-the-clock work, failure to provide spread-of-hours pay and failure to provide accurate wage statements, insofar as those causes of action arise from time logged as sleeper berth or off duty that is unpaid or paid at a rate below the applicable minimum wage. (*See* Pls.' 4/8/24 Not. of Mot. at 2; *see also* SAC ¶¶ 86-127.) All these alleged violations stem from Plaintiffs' assertion that time logged as sleeper berth or off duty was time spent working and, therefore, compensable.

The NYLL "'guarantee[s] compensation for all work . . . engaged in by [covered] employees.'" *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011)). "To establish liability on a claim for underpayment of wages, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Isayeva v. Diamond Braces*, No. 22-CV-04575 (KPF), 2024 WL 1053349, at *5 (S.D.N.Y. Mar. 11, 2024) (cleaned up).

Under the minimum wage provision of the NYLL, "[e]very employer shall pay to each of its employees for each hour worked" an applicable state minimum wage,[18] "or, if greater, such

---

[18] During the class period, that rate ranged from $8.75 from February 17, 2015 (*i.e.*, six years before this action was filed) through December 30, 2015; $9.00 from December 31, 2015 through December 30, 2016; and, beginning on December 31, 2016, would range from $9.70 to $11 for large employers, depending on

other wage as may be established by federal law pursuant to 29 U.S.C. § 206 . . ..".[19] N.Y. Lab. Law § 652; *see also* N.Y. Comp. Codes R. & Regs. ("NYCRR") § 142-2.1. Thus, to state a claim for a minimum wage violation, an employee must allege that for any particular week, his average hourly wage fell below the required minimum wage. *See Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 712 (S.D.N.Y. 2022).

The NYLL also requires employers to pay overtime. *See* NYCRR §§ 142-2.2, 146-1.4. "Once an employee works 40 hours in a week, he must be paid 'one and one-half times his regular rate' for all excess hours." *Isayeva*, 2024 WL 1053349, at *5 (cleaned up). "To state an unpaid overtime claim, a plaintiff must allege only that he worked compensable overtime in a workweek longer than forty hours, and that he was not properly compensated for that overtime." *Soto v. Crismeli Deli Grocery Inc.*, No. 19-CV-10053 (VSB) (BCM), 2024 WL 3730115, at *7 (S.D.N.Y. June 28, 2024) (cleaned up), *report and recommendation adopted*, 2024 WL 3730300 (S.D.N.Y. Aug. 8, 2024). Under the relevant New York regulation, "the regular hourly wage rate shall be determined by dividing the total hours worked during the week into the employee's total earnings." 12 NYCRR § 142-2.16.

Employers also are required to pay covered employees one additional hour of pay at the basic minimum hourly rate on each day on which an employee worked more than ten hours. 12 NYCRR § 146-1.6(a). Thus, to state claim for a spread of hours violation, a plaintiff must allege that he worked more than ten hours per day but was not paid appropriate spread-of-hours

---

whether each hour was worked in New York City, the counties of Nassau, Suffolk or Westchester, or elsewhere in the state, with yearly increases. *See* N.Y. Lab. Law § 652.

[19] During the class period, the federal wage was $7.25 an hour. *See* 29 U.S.C. § 206.

compensation. *See Hermida v. 101 Moronta Food Corp.*, No. 23-CV-04352 (JGLC), 2024 WL 3089962, at *3 (S.D.N.Y. June 20, 2024). "The measure of the workday for this purpose is the number of hours from the time the employee starts his work until he finishes, including work time, non-working time, and even intervals off duty." *Eduoard v. Nikodemo Operating Corp.*, No. 18-CV-05554 (BMC), 2019 WL 13219570, at *6 (E.D.N.Y. Oct. 22, 2019) (citing *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 260 (S.D.N.Y. 2008)). Further, "[t]he Wage Theft Prevention Act of the NYLL requires that employers provide each employee with annual wage notices and accurate wage statements each time wages are paid." *Hermida*, 2024 WL 3089962, at *3 (citing NYLL §§ 195(1)(a) and (3)).

As set forth above, the Court finds there are common questions of fact regarding Swift's policies that are subject to common proof. (*See* Discussion Section I.B., *supra*.) These policies provide the generalized evidence that could be offered by Plaintiffs to prove compensability on a classwide basis. Since Swift did not pay for sleeper berth or off duty time, if such time was compensable, Swift would have failed to pay proper wages, overtime compensation and spread-of-hours pay, and would have failed to provide accurate wage statements.

Swift contends, however, that its policies alone cannot establish liability and the ultimate determination of whether those policies rendered drivers' time primarily for Swift's benefit will depend on individual inquiries related to the experience of each driver. (Defs.' Opp. at 19-22; Defs.' Sur-Reply at 1-5; 6/25/24 Tr. at 104.) Plaintiffs disagree, asserting that Swift's policies imposed restrictions on all drivers that rendered time logged as sleeper berth or off duty compensable, regardless of how individual drivers experienced those restrictions or actually spent their time. (Pls.' Reply at 3-7; 6/25/24 Tr. at 34-35, 64-66.) Swift's argument that its policies

alone are enough to establish that certain hours were subject to Swift's control may or may not be correct. However, Plaintiffs' theory is based upon Swift's policies and their theory is susceptible to common proof. If, it turns out later, that additional individualized evidence is required, Defendants may move to decertify one or more classes.

As discussed during oral argument, this case also raises questions regarding which hours will count towards certain of Plaintiffs' claims. For example, whether only hours logged in New York count for purposes of crossing the 40-hour threshold necessary for an overtime claim, or whether hours logged outside of New York also can be counted. (*See* 6/25/24 Tr. at 26-28.) These too are common questions that can be resolved on a classwide basis.

To be sure, some individual evidence will be required. For example, records for individual drivers will be required to calculate the number of hours worked and to calculate damages. Nonetheless, the Court finds that the common issue of whether time logged as sleeper berth or off duty is compensable is more significant and predominates over issues subject to individual proof. In sum, having considered the factual or legal issues and classified them as subject either to common or individual proof, *see Haley*, 54 F.4th at 121, the Court finds that predominance is satisfied with respect to Classes A, B and C and the HVL Subclasses.

### 3.    Alternative Theory Based On 29 C.F.R. § 785.22

As set forth above, as an alternative to their main theory that all sleeper berth and off duty time is compensable based on Swift's operational policies, Plaintiffs argue that some or all sleeper berth time is compensable based on 29 C.F.R. § 785.22. Plaintiffs suggest that their main class definitions are sufficient to encompass this theory, but "to avoid any doubt[,]" have created subclasses for drivers who were away from their assigned base for 24 hours or more after being

dispatched on a load assignment. (Pl.'s Mem. at 17.) Thus, this theory applies to Subclasses 1 through 3.

Defendants raise numerous arguments against Plaintiffs' theory, but those arguments are primarily merits arguments. (Defs.' Opp. at 16-18.) For example, Defendants argue that Plaintiff's argument presupposes that Plaintiffs can establish that they are engaged in compensable work for 24 hours a day. (*Id.* at 16.) Plaintiffs respond that they will rely on the same common evidence as with their primary theory to establish that they were on duty for 24 hours. (*See* 6/25/24 Tr. at 43.) It seems to the Court that, if time "on duty" means the same thing as time working or compensable time, this theory would be subsumed by Plaintiffs' primary theory regarding compensability. In any event, to the extent Plaintiffs' alternative theory relies upon the same type of evidence as for its primary claim, *i.e.*, evidence of Swift's policies, the Court finds no predominance concern as that evidence is common to the classes. Thus, the Court finds that the common issues regarding compensability predominate over any individual issues such as the calculation of damages and predominance is satisfied for Subclasses 1 through 3.

**B.    Superiority**

Under Rule 23(b)(3), the Court also must find that "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 26(b)(3). To make this determination, the court must consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

and (D) the likely difficulties in managing a class action." *Id*.  Plaintiffs contend that each of these factors has been satisfied. (Pls.' Mem. at 24-25.)

A class action is a superior method to individually litigating NYLL claims in circumstances where, as here, many employees would be unlikely to initiate individual actions. *See Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 169 (S.D.N.Y. 2014); *see also Mangahas v. Eight Oranges Inc.*, No. 22-CV-04150 (LJL), 2024 WL 2801922, at *13 (S.D.N.Y. May 31, 2024) ("As is common in wage and hour actions, it is unlikely that the class members would engage in individual action because the amount of potential recovery is low and likely to be outweighed by the individual cost of litigation.") (cleaned up); *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 126 (S.D.N.Y. 2014) ("[A] class action is superior where, as here, potential class members are aggrieved by the same policy, the damages suffered are small in relation to the expense and burden of individual litigation, and many potential class members are currently employed by the defendants.").

As to the second factor, Plaintiffs assert that they are not aware of any analogous class actions under New York law against Swift (Piller Decl. ¶ 16), and Defendants do not contend otherwise. Defendants focus on the third and fourth factors and argue that Plaintiffs have not demonstrated that a class action is superior because they do not address manageability issues and have not demonstrated that concentrating proceedings in New York is desirable. (Defs.' Opp. at 22.) However, as Plaintiffs point out, it is desirable to concentrate the litigation in this forum because the claims are brought under New York law. Moreover, the Court finds no manageability issues that would defeat superiority. Accordingly, the Court finds that that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy at issue in this action.

III.    **Appointment Of Class Counsel**

Rule 23 requires the Court to appoint class counsel at the time of certification. Fed. R. Civ. P. 23(g)(1); *see also* Fed. R. Civ. P. 23(c)(1)(B) (requiring appointment of class counsel in order certifying the class action). In considering the appointment of class counsel, the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). The Court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Each of these factors supports the appointment of Schneider Wallace Cottrell Konecky LLP as Class Counsel. As set forth above, the Court finds that Plaintiffs' counsel are qualified, experienced and able to conduct this litigation. Their conduct of this litigation to date reveals their knowledge of the law and the resources they have committed to representing the class. Accordingly, I recommend that the Court appoint Schneider Wallace Cottrell Konecky LLP as Class Counsel.

**CONCLUSION**

For the foregoing reasons, it is respectfully recommended that Plaintiffs' motion for class certification be GRANTED with respect to Classes A, B and C and Subclasses 1 through 3 and that the Court further certify HVL Subclasses subject to a further submission by the parties regarding

numerosity with respect to the HVL Subclasses for Classes B and C.[20] It further is recommended that the Court appoint Schneider Wallace Cottrell Konecky LLP as Class Counsel, pursuant to Rule 23(g).

Dated:      New York, New York
            September 6, 2024

_____
**STEWART D. AARON**
**United States Magistrate Judge**

*              *              *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Rochon.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

---

[20] In this regard, the parties may wish to consider stipulating to numerosity of these subclasses, if appropriate, or agreeing to conduct limited discovery on the issue.