UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TAVARES HOBBS, RICARDO BELL, and
ROBERT SHAW, on behalf of themselves and all
others similarly situated,

         Plaintiffs,

     -against-

KNIGHT-SWIFT TRANSPORTATION
HOLDINGS, INC. and SWIFT
TRANSPORTATION CO. OF ARIZONA, LLC,

         Defendants.

Case No. 1:21-cv-01421 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

   Plaintiffs Tavares Hobbs ("Hobbs"), Ricardo Bell ("Bell"), and Robert Shaw ("Shaw") (collectively, "Plaintiffs") bring this putative class action against Defendants Knight-Swift Transportation Holdings, Inc. and Swift Transportation Co. of Arizona, LLC (together, "Defendants" or "Swift"), alleging various violations of the New York Labor Law ("NYLL"). Plaintiffs filed an initial motion for class certification that was denied without prejudice due to deficiencies in numerosity. Following limited discovery into numerosity, Plaintiffs renewed their motion for class certification. Now before the Court are Defendants' objections to the Report and Recommendation of Magistrate Judge Aaron recommending that the Court grant Plaintiffs' motion, further certify High Value Load Subclasses, and appoint Schneider Wallace Cottrell Konecky LLP as Class Counsel. For the reasons stated herein, the Court adopts Magistrate Judge Aaron's Report and Recommendation and GRANTS Plaintiffs' motion for class certification and appointment of class counsel, as well as further certifies additional subclasses.

## BACKGROUND

The Report and Recommendation ("R&R") sets forth the factual background and procedural history of this case, with which the Court assumes the parties are familiar. Dkt. 149 ("R&R") at 2-5.  The Court will briefly summarize the relevant portions of the factual record here for ease of reference.

### I.    Factual Background

Swift operates one of the largest trucking companies in the United States, including three terminals in New York: the Syracuse Terminal, the Johnstown Terminal, and the Amsterdam Terminal.  R&R at 2.  Swift employs at least four types of truck drivers: (1) dedicated drivers, who work in each terminal, picking up merchandise and delivering it to retail locations of assigned customers in eight states, including New York; (2) over-the-road ("OTR") drivers, who are based out of the Syracuse Terminal and transport shipments throughout the country, (3) hourly drivers, who typically operate a "day cab" truck without a sleeper berth and return home every night, and (4) "slip seat" drivers, who are assigned short routes that allow them to return home every night.  R&R at 2, 8.

United States Department of Transportation ("DOT") safety regulations require all drivers to log their time in one of four duty statuses: (1) off duty, (2) sleeper berth, (3) driving, or (4) on duty, not driving.  49 C.F.R. § 395.8(b); R&R at 2-3.  When drivers reach either 11 hours of driving or 14 hours in an on-duty status, DOT regulations prohibit them from driving until they are logged as either off duty or sleeper berth for at least 10 consecutive hours.  49 C.F.R. § 395.3(a).  Swift drivers use devices in the cabs of the trucks to log their hours of service and duty status.  R&R at 3.  Swift does not pay New York drivers for time logged as sleeper berth.  *Id.*  It also does not pay for time logged as off duty, except in the event of a breakdown or other exceptional circumstances.  *Id.*

Plaintiff Hobbs was a driver at Swift from approximately May 2019 to March 2020. Dkt. 131 ("Hobbs Decl.") ¶ 1. He worked primarily on dedicated accounts for Kraft and Sears. Hobbs Decl. ¶ 1. When Hobbs drove for Sears, he was based at a distribution center in Fairless Hills, Pennsylvania, and typically picked up loads there before delivering his loads to locations throughout the Northeast, including New York, New Jersey, Delaware, and Maryland. Hobbs Decl. ¶¶ 1, 3; *see also* Dkt. 135-5 ("Hobbs Dep.") 66:19-67:8, 80:4-81:13. When he made deliveries for Sears, "[i]t was common to have to stay out on the road for the night before coming back to Fairless Hills," since the DOT regulations limited the number of hours he could drive in a 24-hour period without a break. Hobbs Decl. ¶¶ 3-4. Hobbs frequently used the sleeper berth in his cab for his DOT-mandated break, known as a "10-hour reset." Hobbs Decl. ¶¶ 17-18.

Plaintiff Bell worked for Swift from April 2016 to January 2017, primarily as a dedicated driver assigned to the Syracuse Terminal, but he also operated out of the Amsterdam Terminal. R&R at 2; *see also* Dkt. 130 ("Bell Decl.") ¶¶ 1, 5. He was not always able to return to the Amsterdam Terminal after completing his deliveries. Bell Decl. ¶ 6. He states that after making deliveries, he commonly had to take his 10-hour reset before returning to the Amsterdam Terminal. Bell Decl. ¶ 6. He used the sleeper berth in his truck for his 10-hour resets. Bell Decl. ¶¶ 8, 18. Bell was not paid for time logged as "sleeper berth" or "off duty." Bell Decl. ¶ 21.

Plaintiff Shaw was employed by Swift from approximately March to July 2017 and was a dedicated driver based in the Johnstown Terminal. R&R at 2; Dkt. 129 ("Shaw Decl.") ¶ 1. Shaw's deliveries were mostly in New York, but he also made deliveries to other states in the Northeast. Shaw Decl. ¶¶ 3, 4. Because of his delivery schedule, he was often on the road for more than 24 hours before he could return to the Johnstown Terminal. Shaw Decl.

¶ 5.  During such deliveries, he took his required 10-hour reset in the truck's sleeper berth.

Shaw Decl. ¶¶ 5, 7.  Like Plaintiff Bell, Shaw also used the sleeper berth in his truck while

awaiting new deliveries at the Johnstown Terminal and would not return home for several

days.  Shaw Decl. ¶¶ 8-9.  Shaw was not paid for "sleeper berth" or "off duty" time.  Shaw

Decl. ¶ 24.

      At various times, Plaintiffs Hobbs, Bell, and Shaw transported "high-value loads" for

Swift.  Bell Decl. ¶ 17; Hobbs Decl. ¶ 16; Shaw Decl. ¶ 20.

      Swift drivers are subject to a variety of policies that Plaintiffs contend restrict their

activities during time logged as "sleeper berth" or "off duty."  Swift's Driver Handbook sets

forth the duties, responsibilities, and obligations of its drivers, several of which are relevant

here.  R&R at 3-4; *see* Dkt. 128-4 ("Handbook") at 16, 91, 96, 139, 159; Dkt. 136-3.  First,

Swift does not require drivers to use the sleeper berths of their trucks when they are not

driving on the road, but also does not pay drivers for lodging when they are on the road unless

their trucks break down, there are no other trucks available, and the repairs take more than 24

hours.  Handbook at 139 (describing the "Lodging Policy").  Second, drivers are not permitted

to detach their trucks from loaded trailers unless in a Swift terminal or approved drop yard,

and must obtain written permission from property owners to park.  Handbook at 16, 96

(describing the "No Detach/Parking Policy").  Third, Swift prohibits drivers from having

unauthorized passengers or pets in company vehicles.  Handbook at 16 (describing the

"Passenger/Pet Policy").  Fourth, Swift prohibits drivers from possessing any alcohol,

including sealed containers, during their tours, and prohibits drivers from drinking alcohol

within 12 hours of being logged as on duty or in their trucks, including in their sleeper berths.

Handbook at 24-25 (describing the "No Alcohol Policy").  Fifth, Swift limits when drivers

can use their trucks for personal reasons.  Before 2018, Swift prohibited drivers from taking

their trucks on any "personal conveyance," but since 2018, has permitted trucks to drive up to 25 miles or for one hour per day for personal reasons. R&R at 4 (the "Personal Conveyance Policy"). Sixth, Drivers may make a request to be home by entering their driver code, location zip code, and start date in the in-cab logging device. Handbook at 117, 145, 159; R&R at 4 (describing the "At-Home Policy"). Finally, drivers who are transporting "high value loads" are subject to additional restrictions. Those drivers must remain in the truck and the driver may not leave the truck unattended for any reason, including being checked into a hotel, except for short periods to use the restroom, to shower, or to eat. Handbook at 91 (describing the "High Value Load" or "HVL" Policy).

## II.    Procedural History

Plaintiffs filed their initial Complaint in February 2021, proposing a broad putative class of drivers. *See generally* Dkt. 1. Plaintiffs subsequently filed a First Amended Complaint on March 17, 2021. Dkt. 13. On May 19, 2021, Plaintiffs filed the Second Amended Complaint, which proposed a class definition encompassing two classes. Dkt. 36 ¶ 78. On January 12, 2022, in addition to denying a motion to dismiss, the Court denied Swift's motion to strike the proposed class definitions, noting that while the definitions might have been broad as pleaded, it was premature to evaluate the class definitions, including as to ascertainability, based solely on the Second Amended Complaint. Dkt. 46. After conducting class-related discovery under the supervision of Magistrate Judge Aaron, the parties briefed motions regarding class certification in October 2022, and Plaintiffs propounded a new class definition that contained the following three proposed classes:

> Class A: All current and former truck drivers who have been employed by Defendants while being based out of the Walmart Dedicated location in Johnstown, New York and/or the Target Dedicated location in Amsterdam, New York, at any time from February 17, 2015 until the date of class notice.

Class B: All current and former truck drivers who have been employed by Defendants while being based out of Defendants' Syracuse, New York location, at any time from February 17, 2015 until the date of class notice.  Membership in Class B is limited to time logged as "sleeper berth" or "off duty" in New York State.

Class C: All current and former truck drivers who have been employed by Defendants while being based out of a work location outside of New York State, but who have made at least one pickup and/or delivery in New York State and logged sleeper berth time in New York State, at any time from February 17, 2015 until the date of class notice.  Membership in Class C is limited to time logged as "sleeper berth" or "off duty" in New York [S]tate.

The Classes exclude the group of Drivers identified by Swift's Rule 30(b)(6) witness as being paid hourly, typically operating a "day cab" truck without a sleeper berth, and who return home every night.

Dkt. 71 at 2 (emphasis in original).  Magistrate Judge Aaron recommended denying class certification because he concluded that Plaintiffs had not established numerosity.  *Hobbs v. Knight-Swift Transp. Holdings, Inc.*, No. 21-cv-01421 (JLR) (SDA), 2023 WL 3620885, at *7-13 (S.D.N.Y. Feb. 9, 2023) (*Hobbs I*).  The Court adopted the R&R in full over objections from both parties, and modified it to clarify that Plaintiffs could renew their motion for class certification after limited discovery on numerosity.  *Hobbs v. Knight-Swift Transp. Holdings, Inc.*, No. 21-cv-01421 (JLR) (SDA), 2023 WL 3966484, at *1 (S.D.N.Y. June 13, 2023) (*Hobbs II*).

Following limited discovery regarding numerosity, the parties entered a joint stipulation on August 31, 2023, agreeing that numerosity was satisfied with respect to each of the putative classes defined in the SAC or the prior motion for class certification.  Dkt. 116 ("Stip.") at 2-3.  Specifically, Swift agreed that each of the three classes included more than 40 individuals, and that there were more than 40 individuals assigned to either the Johnstown or Amsterdam Terminals who carried "high value loads."  *Id.* at 2-3.

On April 8, 2024, Plaintiffs moved to certify the following classes and subclasses:

Class A: All current and former truck drivers who have been employed by Defendants while being based out of the Walmart Dedicated location in Johnstown, New York and/or the Target Dedicated location in Amsterdam, New York at any time from February 17, 2015 until the date of class notice.

> Subclass 1: all members of Class A who have been away from their assigned base for 24 hours or more after being dispatched on a load assignment, and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York state during such 24-hour period.

Class B: All current and former truck drivers who have been employed by Defendants while being based out of Defendants' Syracuse, New York location, at any time from February 17, 2015 until the date of class notice. Membership in Class B is limited to time logged as "sleeper berth" or "off duty" in New York State.

> Subclass 2: all members of class B who have been away from their assigned base for 24 hours or more after being dispatched on load assignment, and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York state during such 24-hour period.

Class C: All current and former truck drivers who have been employed by Defendants while being based out of a work location outside of New York State, but who have made at least one pickup and/or delivery in New York State and logged sleeper berth time in New York State, at any time from February 17, 2015 until the date of class notice. Membership in Class C is limited to time logged as "sleeper berth" or "off duty" in New York state.

> Subclass 3: all members of Class C who have been away from their assigned base for 24 hours or more after being dispatched on load assignment, and who have logged at least some time as "Sleeper berth" or "Off duty" on DOT driver logs within New York state during such 24-hour period.

Dkt. 125 at 1. The proposed classes exclude drivers "who are paid hourly, typically operating a 'day cab' truck without a sleeper berth, and who return home every night; as well as 'slip seat' Drivers who are assigned short routes that allow them to return home every night." *Id.* The parties fully briefed the motion for class certification and to appoint lead counsel. *See* Dkt. 126 ("Br."); Dkt. 127 ("McNerney Decl."); Dkt. 128 ("Piller Decl."); Shaw Decl.; Bell Decl.; Hobbs Decl.; Dkt. 133 ("Opp."); Dkts. 135 to 137; Dkt. 138 ("Reply").

**III.    The Report and Recommendation**

Magistrate Judge Aaron heard oral argument on the motion on June 25, 2024, Dkt. 147

("Tr."), and issued an R&R on September 6, 2024, recommending that the Court grant

Plaintiffs' motion to certify the aforementioned classes and subclasses, to appoint lead

counsel, and further certify additional HVL subclasses.  R&R at 33-34.

Magistrate Judge Aaron first addressed the applicability of the NYLL.  R&R at 8-12.

Magistrate Judge Aaron concluded that the NYLL would apply to Classes B and C because

Plaintiffs limited their claims to time spent working in New York, but determined that

resolution of whether the NYLL applied to Class A was best addressed in his discussion of

predominance.  *Id.* at 8-11.  He noted several inconsistencies in Plaintiffs' proposed class

definitions for purposes of the applicability of the NYLL, but concluded they did not

undermine class certification at this juncture and were best resolved after further development

of the factual record.  *Id.* at 11-12.

Next, Magistrate Judge Aaron turned to the Federal Rule of Civil Procedure ("Rule")

23(a) factors.  Since the parties had stipulated that each of the proposed classes and subclasses

included more than 40 drivers, Magistrate Judge Aaron found numerosity satisfied.  R&R at

13. He also found commonality satisfied for the Proposed Classes and Subclasses.  He

reasoned that there were common issues of fact and law for the Proposed Classes because

Plaintiffs were relying on common evidence to establish Swift's policies and establish that the

policies rendered sleeper berth and off duty time compensable under the NYLL.  *Id.* at 15-16,

19. Magistrate Judge Aaron also acknowledged that one of Swift's policies — the HVL

Policy — did not apply to all class members because it only applied to those class members

driving high value loads.  *Id.* at 16.  Thus, Magistrate Judge Aaron recommended certifying

additional HVL subclasses.  *Id.* at 17.  He found commonality "easily" satisfied for those

subclasses because the HVL Subclass members would submit common evidence regarding the HVL Policy to establish that the time worked was for Swift's benefit and was thus compensable. *Id.* at 18-19. Finally, Magistrate Judge Aaron found commonality satisfied for the Proposed Subclasses. Plaintiffs rely on a Department of Labor regulation, 29 C.F.R. § 785.22, for these subclasses. Magistrate Judge Aaron concluded that commonality was satisfied because the issue of whether and how section 785.22 applied to the subclass members presented a common question of law. *Id.* at 20. Next, Magistrate Judge Aaron found typicality satisfied because the Plaintiffs' claims stemmed from the same alleged common policies, there was evidence each of the Plaintiffs was harmed by the policies, and at least one named Plaintiff was typical for each of the Proposed Classes and Subclasses. *Id.* at 21-22. He also found adequacy satisfied, since Plaintiffs had a strong interest in vigorously pursuing the class claims, and ascertainability satisfied because objective criteria existed to define the Proposed Classes and Subclasses using Swift's driver logs and other evidence. *Id.* at 23-24.

Magistrate Judge Aaron next considered the Rule 23(b)(3) predominance and superiority requirements. The R&R found predominance satisfied, rejecting Swift's argument that the issue of whether the NYLL applied to Class A would predominate over common issues. R&R at 26-27. He reasoned that the NYLL's applicability to Class A could be resolved through common inquiries and that any individualized issues in resolving that question would not predominate, since the "key issue in this case," whether time logged as sleeper berth or off duty is compensable, was subject to classwide proof and was more significant than any individual inquiry required to resolve choice of law. *Id.* He also noted that other issues in the case, like whether Swift's policies subjected the putative class members to its control, whether hours driven outside New York will count toward Plaintiffs'

overtime claims, and whether plaintiffs were "on duty" within the meaning of section 785.22, were susceptible to common proof and were more significant than issues subject to individual proof.  *Id.* at 28-31.  Finally, Magistrate Judge Aaron found superiority satisfied because the class members were unlikely to initiate individual wage-and-hour claims, no analogous action under New York law was proceeding, the claims were brought under New York law, and there were no manageability issues that would defeat superiority.  *Id.* at 31-32.

In sum, Magistrate Judge Aaron recommended granting the motion for class certification and further certifying HVL Subclasses, subject to additional submissions about numerosity for the Class B and C HVL Subclasses.  R&R at 33-34.  The R&R also recommended that Plaintiffs' counsel, Schneider Wallace Cottrell Konecky LLP, be appointed class counsel.  *Id.*.

Swift timely filed objections to the R&R, *see* Dkt. 150 ("Obj."), and the objections are fully briefed, *see* Dkt. 151 ("Resp."); Dkt. 155 ("Surreply"); Dkt. 157 ("Surresponse").

## LEGAL STANDARDS

### I.    Review of an R&R

With respect to dispositive motions, a district court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see* Fed. R. Civ. P. 72(b)(3).  A district court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  "To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error."  *Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 174 (S.D.N.Y. 2018), *aff'd*, 837 F. App'x 841 (2d Cir. 2021) (summary order).  "Objections of this sort are frivolous, general and conclusory and would reduce the magistrate's work to something akin

to a 'meaningless dress rehearsal.' . . . 'The purpose of the Federal Magistrates Act was to promote efficiency of the judiciary, not undermine it by allowing parties to relitigate every argument which it presented to the Magistrate Judge.'" *N.Y.C. Dist. Council of Carpenters Pension Fund v. Forde*, 341 F. Supp. 3d 334, 336 (S.D.N.Y. 2018) (quoting *Vega v. Artuz*, No. 97-cv-03775 (LTS) (JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "In addition, new arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) (internal citation and quotation marks omitted); *see United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (rejecting argument raised for the first time as objection to report and recommendation).

## II.    Class Certification

"A class may be certified only if, 'after a rigorous analysis,' the district court is satisfied that the prerequisites of" Rule 23(a) "are met." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Rule 23(a) establishes four prerequisites to class certification: numerosity, commonality, typicality, and adequacy of representation. *See Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022). In addition, the Second Circuit has "recognized an 'implied requirement of ascertainability.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2014) (quoting *In re Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)); *accord Nguyen-Wilhite v. Tapestry, Inc.*, No. 23-cv-03339 (JLR), 2025 WL 504628, at *3 (S.D.N.Y. Feb. 14, 2025).

"Beyond these prerequisites, Rule 23(b) provides additional considerations for a district court to consider prior to the certification of a class." *Sykes v. Mel S. Harris & Assocs.*

*LLC*, 780 F.3d 70, 80 (2d Cir. 2015). As relevant here, Rule 23(b)(3) "imposes two additional burdens on plaintiffs attempting to proceed by class action, namely, predominance and superiority." *Id.* at 81. "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (first citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); and then citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202-03 (2d Cir. 2008)).

## DISCUSSION

Swift objects to the R&R's conclusions that Plaintiffs satisfied commonality, adequacy of representation, ascertainability, predominance, and superiority.[1] The parties dispute at length what standard of review to apply to these objections. *See* Obj. at 6; Resp. at 3-6; Surreply at 1-3; Surresponse at 1-3. Though many of Swift's objections were raised previously and expressly addressed by Magistrate Judge Aaron, warranting a review only for clear error, the Court will review all of Swift's objections under a *de novo* standard in an abundance of caution. *See, e.g.*, *Menking ex rel. Menking v. Danies*, 287 F.R.D. 174, 178 (S.D.N.Y. 2012).

### I.    The Rule 23(a) Requirements are Satisfied

Defendants do not object to the R&R's findings as to numerosity and typicality. *See generally* Obj. The Court has reviewed those findings for clear error, finds those requirements satisfied for the Proposed Classes and Subclasses, as well as for the Class A

---

[1] Swift also makes the "thematic" objection that the R&R generally did not engage in the requisite "rigorous" review of class certification. Obj. at 6-9. Having reviewed the R&R, as well as the transcript of the lengthy, detailed, and rigorous hours-long oral argument Magistrate Judge Aaron ably conducted, *see generally* Tr., the Court finds no merit in such an objection.

HVL Subclass, and adopts the recommendations of the R&R with respect to numerosity and typicality.[2]  Defendants object to the R&R's conclusions regarding commonality, adequacy of representation, and ascertainability, which the Court will now address in turn.

### A.  Commonality

Swift first argues that Magistrate Judge Aaron erred in concluding that Plaintiffs satisfied commonality.  *See* Obj. at 9-15.  The Court does not agree.

"To satisfy commonality, plaintiffs must affirmatively demonstrate by a preponderance of the evidence that there are questions of law or fact common to the class." *Elisa W. v. City of New York*, 82 F.4th 115, 122-23 (2d Cir. 2023) (citing *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015)).  Commonality "turns on the ability of the action to 'generate common answers apt to drive the resolution of the litigation.'"  *Id.* at 123 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted)). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."  *Haley*, 54 F.4th at 121 (quoting *Johnson*, 780 F.3d at 137).

Plaintiffs move to certify classes that seek to enforce wage and hour obligations under the NYLL and that implicate a Department of Labor regulation regulating "[d]uty of 24 hours

---

[2] Magistrate Judge Aaron also recommended that the Class B and C HVL Subclasses should be certified subject to additional submissions by the parties about numerosity for those two subclasses.  R&R at 18-19, 33-34.  Neither party objects to this recommendation and the Court adopts it, since Plaintiffs have not submitted evidence that would permit the Court to determine that they have satisfied numerosity for the putative Class B and C HVL Subclasses. *See* Stip. at 3 (stipulating that more than 40 individuals were assigned to the Johnstown or Amsterdam Terminal and had carried a load designated by Swift as high value during the class period, but no present stipulation for Classes B and C).  If no stipulation is reached regarding Classes B and C, the Court will permit the parties to undertake discovery as to whether the Class B and C HVL Subclasses satisfy numerosity.

or more," 29 C.F.R. § 785.22 ("section 785.22").  Classes A, B, and C seek relief based on the NYLL, while Subclasses 1, 2, and 3 also implicate section 785.22 for drivers who have been away from their assigned base for more than 24 hours after dispatch.  Plaintiffs' core theory of liability for all classes is that Swift's uniform policies — such as the Lodging Policy, No Detach/Parking Policy, Passenger/Pet Policy, No Alcohol Policy, At-Home Policy, and HVL Policy (for the three additional subclasses recommended by Judge Aaron) — together restrict drivers' time in a manner such that Swift was legally required to compensate the class members for additional hours of sleeper berth and off duty time.  *See* Br. at 1-2; Tr. 29:1-13.

Swift contends that Magistrate Judge Aaron incorrectly found commonality satisfied because he (1) erroneously treated Swift's policies as generating common questions for the Proposed Classes and did not consider the evidence that shows that the effect of Swift's policies will not generate common answers; and (2) incorrectly found the Proposed Subclasses satisfied commonality.  *See* Obj. at 9-15.  The Court addresses each objection in turn.

### 1.  *The Proposed Classes Satisfy Commonality*

Magistrate Judge Aaron correctly concluded that Swift's common policies generate a common question that "lend[s] itself to 'classwide resolution.'"  *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 86 (S.D.N.Y. 2017) (quoting *Dukes*, 564 U.S. at 350).  "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."  *Haley*, 54 F.4th at 121 (quoting *Johnson*, 780 F.3d at 137).  Plaintiffs claim that Swift has a set of uniform policies governing drivers' time that operate together to restrain sleeper berth and off duty time and render that time for Swift's benefit.  Br. at 1-3.  There is no question that these policies (with the exception of the HVL Policy, which applies to a more limited subset of drivers) apply to all members of the

Proposed Classes. Plaintiffs contend that these policies render the class members' sleeper berth and off duty time subject to Swift's control and that Swift's policy of not paying drivers for this time violates the NYLL. Answers to these questions are susceptible to common proof, including evidence regarding the uniform policies/handbook and how they functioned to restrict the class members, and Swift's 30(b)(6) depositions. *See* Handbook; Dkt. 128-1 ("Quast 30(b)(6) Dep."); *see, e.g.*, *Ayala v. U.S. Express Enters., Inc.*, No. 16-cv-00137, 2017 WL 3328087, at *10 (C.D. Cal. July 27, 2017) (question of whether trucking company's policies subjected its employees to employer's control was subject to common proof about whether the policies rose to the level of employee control that would require compensation).

The class certification decision in *Bouissey v. Swift Transportation Co.* is instructive. *See generally* No. 19-cv-03203, 2022 WL 16957830 (C.D. Cal. Sept. 27, 2022) (*Bouissey I*). In that case, truck drivers sued Swift under California law based on a similar legal theory and sought to certify a class. *See id.* at *1 ("Plaintiffs allege that Swift maintained policies requiring its drivers to record time as 'off duty' or 'sleeper berth' in circumstances where they were subject to Swift's control and entitled to payment."). The district court granted class certification and found commonality satisfied based on these policies, including, as relevant here, the HVL Policy, No Detach/Parking Policy, Passenger/Pet Policy, Personal Conveyance Policy, and No Alcohol Policy. *See id.* at *5-6. The court found that there were questions of law common to the class, including whether the policies sufficiently restricted the drivers' use of off duty and sleeper berth time such that the time was compensable under California law. *Id.* The Court finds this analysis persuasive, particularly since the *Bouissey* plaintiffs relied on policies and legal theories like the ones presented here. Plaintiffs here have provided evidence of Swift's uniform policies, and similar common questions of fact and law will drive the resolution of this litigation, notwithstanding any ultimate determination on the merits. *See*

*Bouissey I*, 2022 WL 16956830, at *6 (declining to reach merits arguments that did not go to the issue of commonality on motion for class certification).

Swift objects that Magistrate Judge Aaron should not have relied on Swift's "lawful" policies in finding commonality satisfied because "lawful common policies alone are insufficient to support commonality or warrant class certification." Obj. at 10. The fact that Swift may have numerous policies that are otherwise legal is not the relevant inquiry. Plaintiffs' argument is that Swift's combined policies — even if each policy was legal — allegedly restrained the putative class's conduct, resulting in Swift violating the law by failing to pay drivers for sleeper berth or off duty time pursuant to the NYLL. Plaintiffs may rely on these uniform policies to address the common question of whether Swift's practice regarding nonpayment of all sleeper berth and off duty time violated the NYLL; indeed, courts in this Circuit "regularly certify classes where the legality of a practice is an open question." *Alfonso v. FedEx Ground Package Sys.*, No. 21-cv-01644, 2024 WL 1007220, at *11 (D. Conn. Mar. 8, 2024) (collecting cases).

Swift's argument to the contrary overreads the Supreme Court's holding in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338. In *Dukes*, the Supreme Court held that in the absence of an express company policy that violated the plaintiff-employee's rights, a putative class could satisfy commonality through "[s]ignificant proof that an employer operated under a general policy of discrimination," including "statistical and anecdotal evidence," *id.* at 352-53, 356 (alteration in original) (citation omitted), which lower courts have referred to as a "de facto policy," *see, e.g.*, *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (S.D.N.Y. 2015). Unlike in *Dukes*, where isolated instances of manager behavior were evaluated for purposes of determining whether Wal-Mart had a *de facto* policy of discrimination even if no express policy existed, 564 U.S. at 355-56, there is no dispute here that the common Swift policies

16

existed.  The only question is whether the combination of those policies had the effect of violating the NYLL.  In other words, Plaintiffs contend that the combination of Swift's express policies governing how drivers spend their time renders Swift's uniform policy of not paying drivers for sleeper berth and off duty time unlawful under the NYLL.  They have satisfied commonality by identifying common evidence suggesting that these common policies and resultant unlawful payment practice exists.  *See, e.g.*, *Bouissey I*, 2022 WL 16957830, at *5-6 (plaintiffs satisfied commonality where they identified several policies that applied to the putative class members that generated questions of law common to the class); *Petrone v. Werner Enters., Inc.*, No. 11-cv-00401, No. 12-cv-00307, 2017 WL 510884, at *11 (D. Neb. Feb. 2, 2017) (plaintiffs satisfied commonality because they "allege[d] they were victimized by a single and centralized common practice and policy, which uniformly affected the entire class"); *cf. Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (district court properly found commonality satisfied where NYLL class claims "all derive[d] from the same compensation policies and tipping practices"); *Alfonso*, 2024 WL 1007220, at *12 (plaintiffs satisfied commonality by identifying common policies governing security screening and pay policies that presented legal questions capable of classwide resolution).

Swift's citations to *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279 (S.D.N.Y. 2015), *aff'd*, 687 F. App'x 39 (2d Cir. 2017) (summary order), *abrogated in other part sub nom. Scott v. Chipotle Mexican Grill*, 954 F.3d 502 (2d Cir. 2020), and *Pichardo v. Carmine's Broadway Feast Inc.*, Nos. 15-cv-03312 (RA), 15-cv-04046 (RA), 15-cv-04049 (RA), 2016 WL 5338551 (S.D.N.Y. Sept. 23, 2016), also do not counsel a different result.  In *Ruiz*, the plaintiffs argued that a putative class of personal bankers had not been compensated for overtime hours in violation of the NYLL, and sought to establish a *de facto* policy of denying

overtime. 93 F. Supp. 3d at 282, 289. The court held that the plaintiffs had not established that such a policy existed because "the only evidence of [a] uniform corporate policy [was] Citibank's entirely legal employment practices — here, repeated admonitions in training materials, handbooks, and communications that any overtime incurred must be paid," *id.* at 290, and the anecdotal evidence of deviations from this uniform policy would not produce common answers to the common questions presented, *id.* at 289-94. As a result, the *Ruiz* plaintiffs did not satisfy the commonality requirement. Here, by contrast, Plaintiffs aim to show that Swift's common policies, rather than anecdotal instances of policy deviations, restrict the class members such that Swift's uniform practice of not paying for any sleeper berth or off duty time is unlawful. Swift further mischaracterizes *Pichardo* in arguing that certification in that case was only appropriate because the "common policy was unlawful," Obj. at 9. The court in *Pichardo* did not find commonality because defendant's payment policy was unlawful but instead found that claims like plaintiffs' regarding the unlawfulness of the policy were "routinely certif[ied] . . . based on evidence of a common policy" and "could be resolved with generalized proof." 2016 WL 5338551, at *3. Likewise here, Plaintiffs need not establish that Swift's policies are unlawful as a prerequisite to certification, but instead can rely on common proof of Swift's uniform policies to establish that there are common questions about whether Swift ultimately violated the NYLL.

Swift next argues that Magistrate Judge Aaron erred in not considering evidence indicating that the policies are not common to the drivers and affect drivers in "highly varied" ways. Obj. at 11-12. The Court is not persuaded. First, Swift singles out in particular the No Alcohol, Pet/Passenger, At-Home, and No Detach/Parking Policies, contending that certain policies are irrelevant to certain sets of drivers or did not apply to them (for example, those who elect not to drink alcohol). Obj at 11 & n.3. There are several flaws with this argument.

First, the suggestion that the policies do not apply to all drivers is difficult to square with language in the Driver Handbook expressly stating that "[e]mployees, officers, and board members are expected to abide by th[e] Code [of professional conduct] as well as any other applicable Swift policies or guidelines in the Driver and Non-Driver handbooks relating to the areas covered by this Code."  Handbook at 19.  These prohibitions can be found in a long list of "prohibited conduct" that applies to all employees, regardless of whether they generally engage in the prohibited activity.  *See id.* at 16 (listing prohibitions on, among other things, texting while driving, concealing weapons, deviation from an assigned work schedule, or possessing a radar detector); *id.* at 20 (drug and alcohol policy).  Second, Plaintiffs' theory of liability is not that any single policy gives rise to control, but that the policies, taken together, result in such significant overall restrictions during time otherwise designated as sleeper berth or off duty that such time is for Swift's benefit and is thus compensable.  Under Plaintiff's theory, the overall impact of the policies must be evaluated together for purposes of assessing control.  Therefore, that a particular driver elected not to engage in behavior covered by a policy does not undermine commonality.  For now, Plaintiffs have identified evidence that common policies exist that on their face apply to all drivers, thereby creating a common question of whether these policies established the requisite level of control by Swift; that is enough, at this stage, to satisfy commonality under Plaintiffs' theory of liability, even if a merits determination may not ultimately support a finding of control.  Finally, the argument that many of the policies are tangential to driver activity, such as having a pet in the truck, is unpersuasive.  Other courts have considered restrictions on "nonemployee visitors, pets, and alcohol use" relevant to the question of whether an employer exercised sufficient control over employees, *cf., e.g.*, *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1083 (9th Cir. 2020) (citation omitted) (consideration of such policies appropriate under California law), and Swift's

attempt to characterize these rules as "peripheral" (despite the fact that drivers must respect these rules at all relevant times during their shifts) is unconvincing. The impact of a particular policy is a merits question about whether it contributes to the required level of control by Swift. But that question as well as the question of whether the policies overall created sufficient control over the drivers' time involve common legal questions subject to common proof.

Finally, Swift asserts that Magistrate Judge Aaron should have denied class certification based on the policies because the *Bouissey* court purportedly "already . . . determined [them] to be incapable of answering whether time spent in a sleeper berth or off duty is compensable as a matter of law." Obj. at 12; *see id.* at 12-14. Swift's reliance on the *Bouissey* decisions is misplaced for a number of reasons. *See generally Bouissey I*, 2022 WL 16957830; *Bouissey v. Swift Transp. Co.*, No. 19-cv-03203, 2023 WL 3400620 (C.D. Cal. Apr. 5, 2023) (*Bouissey II*) (granting in part defendant's motion for summary judgment); *Bouissey v. Swift Transp. Co.*, No. 19-cv-03203, 2024 WL 649246 (C.D. Cal. Jan. 30, 2024) (*Bouissey III*) (granting defendant's motion to decertify the remaining classes and denying plaintiffs' motion for summary judgment). First, Swift misstates the court's holdings in both *Bouissey I* and *Bouissey II*, claiming that the court held that the Swift policies at issue here were "incapable" of answering common questions, Obj. at 12-13. In *Bouissey I*, the court declined to certify a class based on Swift's purported prohibition against drivers leaving the vicinity of their trucks because the plaintiffs had not "provided 'significant proof' that Swift operated under the policy they describe[d]" — a policy not at issue in the present case. 2022 WL 16957830, at *4. However, the court *did* certify a class based on Swift's HVL policies and the other common policies at issue here, including Swift's No Pet/Passenger Policy and the No Alcohol Policy. *See id.* at *5-6. In *Bouissey II*, the court concluded on summary

judgment that, based on the evidence of the policies adduced during discovery, some of the policies did not give rise to control under California law. 2023 WL 3400620, at *7-9. The different procedural posture of *Bouissey II* is critical. After evaluating the merits of the case and weighing the particular evidence presented on summary judgment, the court found that defendant's policies did not "amount to control." *See id.* at *6, 9. By contrast, it is "beyond well-settled that a motion for class certification is not a vehicle for deciding the merits of the case," and the "dispositive question" is instead "whether the requirements of Rule 23 have been met." *Guadagna v. Zucker*, 332 F.R.D. 86, 92 (E.D.N.Y. 2019); *see also, e.g.*, *Alfonso*, 2024 WL 1007220, at *11 (answer to whether defendant's policy of not paying employees for security or walking time violated Connecticut law was "a legal question, the answer to which the [c]ourt should not determine at the class certification stage where — as here — such a determination is not necessary to assessing whether the Rule 23 requirements have been met"). *Bouissey II* may very well be relevant to any future summary judgment motion after the evidence has been presented about the common policies at issue here, but it does not require the denial of the motion for class certification.[3]

Swift also points out that the surviving HVL class was ultimately decertified in *Bouissey III*. This gives the Court little pause: the *Bouissey* HVL subclass was decertified not because of issues with commonality or predominance, but because the named plaintiffs failed to satisfy typicality as they had "never driven a high value load." *Bouissey III*, 2024 WL 649246, at *5. Swift makes no suggestion that similar problems plague the named plaintiffs

---

[3] While Swift faults the R&R for not discussing *Bouissey II*, Obj. at 13, Magistrate Judge Aaron discussed it at length with the parties during oral argument, *see, e.g.*, Tr. 54:4-22, 55:4-23, 90:2-93:25. Moreover, given that *Bouissey II* does not compel denial of the certification for the reasons set forth above, Magistrate Judge Aaron did not err by not explicitly addressing it in the R&R.

here, and indeed each of their declarations states that they drove high-value loads during their employment with Swift, *see* Bell Decl. ¶ 17; Hobbs Decl. ¶ 16; Shaw Decl. ¶ 20.  Thus, *Bouissey III* does not persuade the Court that commonality is unsatisfied here.[4]

Finally, Swift's reliance on *Dueker v. CSRT Expedited, Inc.*, No. 18-cv -08751, 2020 WL 7222095 (C.D. Cal. Dec. 7, 2020), and *Pavloff v. Cardinal Logistics Management Corp.*, No. 20-cv-00363, 2020 WL 6821072 (C.D. Cal. Oct. 7, 2020), does not undermine the R&R's finding of commonality.  *Dueker* and *Pavloff* each considered whether to certify classes of truckers who claimed their employers' policy of denying pay for sleeper berth time violated California law.  Each court denied class certification based in part on commonality concerns but for reasons that do not counsel a similar result here.  Both cases relied only on a common policy of not paying truck drivers for time spent in sleeper berths or off duty, but not, as here, on uniform policies that allegedly restricted the activities of the drivers such that they were effectively under the control of their employers during their sleeper berth and off duty time. *See Dueker*, 2020 WL 7222095, at *6; *Pavloff*, 2020 WL 6821072, at *5-*6.  In addition, the *Dueker* plaintiffs sought to prove their theory of liability, which "depend[ed] on class-wide evidence of drivers' presence in the sleeper berth of a truck moving in California," by reference to flawed timekeeping and payroll data.  *See* 2020 WL 7222095, at *6.  The *Dueker* court analyzed commonality and predominance together and found predominance (not commonality) unsatisfied because the record raised individualized issues related to inaccuracies in drivers' logs and testimony that were likely to predominate over common issues.  *See id.* at *6-7 (assuming arguendo that the "legal theory" about common questions

---

[4] The *Bouissey III* court also decertified the remaining high-theft area ("HTA") class, since the data the plaintiffs relied on was unreliable.  *See* 2024 WL 649246, at *6-8.  Plaintiffs have not moved to certify an HTA class and Swift does not argue that the same deficiencies undermine the proof relied upon by Plaintiffs.

was "sound" and denying class certification because of the predominance of individualized issues in the record). The same evidentiary concerns have not been raised here.

In sum, Plaintiff's claims present common questions capable of classwide resolution, such as whether Swift's uniform policies control the drivers in such a manner that not paying drivers for sleeper berth or off duty time runs afoul of the NYLL. As such, Magistrate Judge Aaron properly found commonality satisfied for the Proposed Classes.

### 2. The Proposed Subclasses Satisfy Commonality

Swift next objects to the R&R's conclusion that the Proposed Subclasses satisfy commonality. Specifically, Swift contends that the question of whether section 785.22 applies is not a common question subject to common proof, and that resolving the applicability of section 785.22 to the subclasses would not be amenable to a common resolution. The Court is unpersuaded by Swift's objections.

Section 785.22 provides that where employees are "required to be on duty for 24 hours or more, the employer and the employee may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.22(a). To demonstrate that section 785.22 applies, the Plaintiffs will have to demonstrate that they were "on duty" for 24 hours or more. *See Julian v. Swift Transp. Co.*, 360 F. Supp. 3d 932, 952 (D. Ariz. 2018) ("[T]ruck drivers, just like all other employees, are subject to § 785.22 when they are on duty for 24 hours or more."). While Swift claims that Plaintiffs' theory under section 785.22 is that "Section 785.22 automatically renders time in a sleeper berth compensable," Obj. at 14, Plaintiffs' central theory, expressed at oral argument and in their papers, is instead that they can establish they were "on duty" for more than 24 hours through common evidence of Swift's policies that

restricted them during those extended periods of time, thereby triggering section 785.22, *see* Resp. at 8-9; Tr. at 43:4-12. This involves the resolution of at least two common legal questions, namely: (1) do Swift's policies sufficiently control drivers such that when they are logging time as sleeper berth or off duty, they are nonetheless "on duty" for more than 24 hours for the purpose of the DOL regulation, and (2) how is section 785.22 applied to these truck drivers who are on duty for more than 24 hours. These questions are capable of classwide resolution, and indeed several federal courts have held similarly in certifying collective or class actions. *See, e.g.*, *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 420-21 (D. Mass. 2018) (trucking defendants' "set of standard policies or practices for new drivers . . . raise[d] common legal questions"); *Browne v. P.A.M. Transp., Inc.*, No. 16-cv-05366, 2019 WL 333569, at *3-4 (W.D. Ark. Jan. 25, 2019) (identifying "whether class members were on duty for periods of 24 hours or more" as a common question that could be proved "with evidence that is common among all class members, such as [defendant]'s driver manuals, trainer manuals, and administrative records").

Swift's citation to *Bouissey II* does not persuade the Court that commonality cannot exist based on section 785.22. In *Bouissey II*, the court held that, after examining the policies and evidence presented in that case the class members had not shown that they "were subject to their employer's control 24 hours per day for every day that they were on a tour of duty." *Id. Bouissey II* therefore does not compel the conclusion that section 785.22 does not create common questions but rather counsels that the prerequisite question — whether the Swift policies here result in drivers being under Swift's control for more than 24 hours — is relevant to determining the potential application of section 785.22. If it is established that drivers were under the control of Swift for more than 24 hours, the question of whether

section 785.22 applies to class members, and how many hours they must be paid for, can be answered in common by reference to DOL guidance and otherwise. *See* Tr. 43:13-22.

Swift also faults the R&R for its brief analysis of whether the applicability of section 785.22 is a common question subject to common proof. Obj. at 14. Given that the question of whether the drivers remain under the control of their employers because of uniform restrictive policies overlaps with the analysis under the regulation of whether they have been on duty for more than 24 hours, the R&R's summary conclusion regarding section 785.22 was appropriately brief. *See* Tr. 51:15-52:10 (Swift arguing that the NYLL and section 785.22 theories depend on "the same inquiry, meaning . . . do the policies sufficiently restrict the drivers or evidence control"); *see also id.* 43:7-12 (similar argument).[5]

## B. Adequacy of Representation

Swift also objects to Magistrate Judge Aaron's conclusion that Plaintiff Hobbs would be an adequate class representative for Proposed Class C. Obj. at 22. The Court disagrees and finds adequacy of representation satisfied.

Rule 23(a) requires that "representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]wo factors generally inform" whether a named class representative is adequate: "(1) absence of conflict and (2) assurance of vigorous prosecution." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001), *abrogated on other grounds by Dukes*, 564 U.S. 338). "For this reason, '[t]he named plaintiffs . . . cannot represent a class of whom they are not a part, and can represent a class of whom they are a part only to the extent of the

---

[5] Swift does not object specifically to Magistrate Judge Aaron's recommendation to further certify additional HVL Subclasses. The Court has reviewed this recommendation for clear error and agrees that the HVL Subclasses satisfy commonality.

interests they possess in common with members of the class.'" *Id.* (alteration in original) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 17 (2d Cir. 1981)). Hobbs is the proposed representative for Class C and the related subclasses. As relevant here, Class C drivers are "[a]ll current and former truck drivers who have been employed by Defendants while being based out of a work location outside of New York State." R&R at 7. The crux of the dispute between the parties is whether the record reflects that Hobbs was "based at a work location outside of New York State" during the class period.

Having reviewed the record, the Court concludes that Plaintiffs have established by a preponderance of the evidence that Plaintiff Hobbs was based in Fairless Hills, Pennsylvania, "a work location outside of New York State," during the class period. Hobbs swore in his declaration that when he drove for Swift between May 2019 to March 2020 he worked on a dedicated account for Sears. Hobbs Decl. ¶¶ 1, 3. When he drove routes on the Sears account, he was based at a distribution center in Fairless Hills, Pennsylvania. *Id.* ¶ 3. Hobbs confirmed this in his deposition testimony. *See* Hobbs Dep. 80:4-82:8, 84:18-86:4. Hobbs's additional deposition testimony that he did not have a dedicated home base when he drove on the Kraft account is inconsequential. *See* Obj. at 22. Hobbs has established that he was based in Pennsylvania for at least part of the relevant class period, and the Court is satisfied that Hobbs possesses common interests with the class members that provides the assurance of vigorous prosecution. *See Irvin*, 944 F.3d at 71. Indeed, Swift does not cite any authority suggesting that a similarly situated class representative would be an inadequate class representative. *See* Obj. at 22. The Court agrees with Magistrate Judge Aaron's findings as to adequacy of representation.

### C.  Implied Requirement of Ascertainability

Finally, Swift contends that the R&R erroneously found the proposed classes ascertainable.  *See* Obj. at 22-23.  The Court disagrees and finds ascertainability satisfied.

Courts in the Second Circuit require plaintiffs seeking class certification to satisfy, in addition to the Rule 23(a) requirements, the "implied requirement of ascertainability."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 30; *see also Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 70 (S.D.N.Y. 2022) ("There is also an implied requirement of ascertainability in this Circuit — i.e., that there be an identifiable class."); *M.G. v. N.Y.C. Dep't of Educ.*, 162 F. Supp. 3d 216, 233 (S.D.N.Y. 2016) (similar).  The ascertainability requirement "asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 294 (2d Cir. 2017).  At the certification stage, movants need not "show[] administrative feasibility," *id.* at 265, and instead need only show that the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member," *id.* at 266 (quoting *Brecher*, 806 F.3d at 24).  *Accord Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716-17 (2d Cir. 2023); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548 (S.D.N.Y. 2021).

Swift first argues the Proposed Classes and Subclasses are not ascertainable after June 2021 because its software stopped tracking locations where drivers entered duty status changes.  Obj. at 22-23.  Magistrate Judge Aaron found that, even if Swift's new tracking software stopped including location data, *see* Dkt. 134-8, ¶ 8, the post–June 2021 information would be available from PDF records.  R&R at 23-24.  Putting aside that this covers only a portion of the class period, the fact that manual review may be necessary does not defeat ascertainability.

*Dunnigan v. Metropolitan Life Insurance Co.*, 214 F.R.D. 125 (S.D.N.Y. 2003), is instructive.  In *Dunnigan*, the proposed class members could be identified by reference to (1) a computer-generated list of individuals for the period between 1999 and 2001 and (2) manual examination of the individual files of the putative class members.  *Id.* at 135-136.  The court in *Dunnigan* found ascertainability satisfied even though some class members could only be identified through manual review, explaining that "[t]he fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement," since the class could still be identified.  *Id.* at 136.  Indeed, many federal courts have rejected similar arguments, holding that the need for individualized, manual review does not defeat ascertainability.  *See, e.g.*, *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015) (need to manually sift through electronic data for individual class members to determine class membership did not defeat ascertainability because "the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable"); *Moreno v. Napolitano*, No. 11-cv-05452, 2014 WL 4911938, at *6-7 (N.D. Ill. Sept. 30, 2014) (class was ascertainable even though identifying the class required manually reviewing forms); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 145-46 (D. Md. 2022) (need to review individual files to identify class members did not defeat ascertainability, even though the potential class sizes were large and identification would be time-consuming); *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 407 (D. Md. 2023) (similar and collecting cases).

*Wang v. Tesla, Inc.*, 338 F.R.D. 428 (E.D.N.Y. 2021), upon which Swift relies, is distinguishable.  The plaintiffs in *Wang* sought to certify a class of Tesla owners who had been in car crashes because of sensor and data transmission issues.  *See id.* at 439.  The proposed class was not ascertainable in *Wang* because determining whether a particular

individual fit within the class definition would have required determining: (1) whether a sensor assessed an imminent hazard or dangerous situation (and it was unclear that this was determinable through Tesla's own data), and (2) whether an accident occurred because of a data transmission failure instead of some other cause. *Id.* at 439-40. The court reasoned that these determinations would be "intensely time-consuming," particularly since the parties had spent years in discovery on the same issues and complex determinations would have to be made for "each Tesla accident nationwide," indicating the class was not ascertainable. *Id.* at 440. Here, by contrast, identifying class members would only require reviewing PDFs that Swift admits contain the location information and that it can produce. *See* Dkt. 134-8 ¶ 9. While this may take additional time, such a manual review does not present the difficulties present in *Wang*. *See, e.g.*, *Freund v. McDonogh*, 114 F.4th 1371, 1378 (Fed. Cir. 2024) (defendant's representation that manual review would require "at least hundreds of thousands of work-hours" did not defeat ascertainability, citing majority rule that "there is no basis for finding a lack of ascertainability because it is difficult to identify the class members"). In addition, counsel for Swift acknowledged at oral argument that given today's technology capabilities, collection of the data is possible without "herculean efforts." Tr. 79:20-80:16. Thus, the Court is satisfied that objective criteria exist and that Swift can produce data to determine class membership.

Swift next argues that the class definitions are overbroad and will sweep in drivers that returned home every night and did not use a sleeper berth, but logged time as "off duty." Obj. at 23. The Proposed Class definitions exclude drivers "who are paid hourly," that is, those who operate "day cab" trucks without sleeper berths or "slip seat" drivers, both of whom return home every night. Dkt. 125 at 1. Like Magistrate Judge Aaron, the Court finds persuasive Plaintiffs' explanation that the excluded "day cab" and "slip seat" drivers can be

identified because they never would have used sleeper berths and thus never would have logged any time as sleeper berth.  *See* R&R at 24 (citing Tr. 76:2-77:7).  The Court thus concludes that the Proposed Classes and Subclasses meet the threshold for ascertainability.

## II.    Requirements of Rule 23(b)(3)

Swift next objects to the R&R's recommendations that Plaintiffs satisfied Rule 23(b)(3)'s predominance and superiority requirements.  Obj. at 15-22.  The objections are unavailing, and the Court finds that Plaintiffs have established predominance and superiority.

### A.  Predominance

With respect to predominance, Swift again argues that its policies are not susceptible to common proof, that section 785.22 assessments will be overwhelmed by individualized issues about how different employees experienced the policies, and that individualized choice of law issues will predominate.  Obj. at 15-22.  For the reasons that follow, the Court does not agree.

"Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Roach*, 778 F.3d at 405 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).  "Like the commonality inquiry, a court examining predominance must assess (1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief.'"  *Johnson*, 780 F.3d at 138 (quoting 1 *McLaughlin on Class Actions* § 5:23).  The predominance inquiry also requires considering "whether the common

issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Id.*

       1.  *Swift's Policies*

Swift argues that reliance on the uniform policies cannot satisfy the predominance requirement because it ignores the individualized inquiry concerning the effect of the policies on drivers. Swift claims that the R&R erred by not balancing these individualized issues against the purported commonalities in the policies. Obj. at 15-17. The Court disagrees.

Swift's citation to the individualized experiences of drivers to demonstrate variation in how the drivers experienced the policies does not defeat predominance. First, Swift's argument "ignores Plaintiffs' theory of the case," which is that Swift's policies give rise to control regardless of how the plaintiffs actually spent their time. Resp. at 15; *see* R&R at 29-30; Tr. 34:12-20 (explaining that "[i]f the employee is restricted by those policies, which they are if the policy applies, and the Court . . . or a finder of fact determines on the merits that the level of restriction engendered by those policies is sufficient to give rise to control, then they are entitled to compensation"); Tr. 36:19-37:3 (explaining that individual variation is not relevant to liability "because the jury is going to be evaluating the level of control engendered by the policies themselves"). As Magistrate Judge Aaron correctly observed, whether the "policies alone are enough to establish that certain hours were subject to Swift's controls may or may not be correct," but the theory is based on uniform policies "susceptible to common proof." R&R at 30; *see also Bouissey I*, 2022 WL 16957830, at *7 (finding that "common questions concerning Swift's well-established policies, including those restricting the use of the truck, alcohol consumption, as well as those pertaining to high-value loads and high-theft areas, 'represent[ed] a significant aspect of the case' that 'can be resolved for all members of

the class in a single adjudication'" (quoting 7AA Wright & Miller, *Federal Practice and Procedure* § 1778 (3d ed.)).

*Browne v. P.A.M. Transportation, Inc.*, 2019 WL 333569, reached a similar conclusion.  In that case, the named plaintiffs similarly argued that the defendant's policies meant that when they were on the road for periods of time greater than 24 hours, "they were 'on duty' for that entire period, regardless of how their time was logged during that period." *Id.* at *4.  The plaintiffs "intend[ed] to prove this [theory] with evidence that [was] common among all class members, such as [defendant]'s driver manuals, trainer manuals, and administrative records, as well as testimony by [defendant's] executives, managers, supervisors, and trainers."  *Id.*  The court found predominance satisfied despite the fact that the defendant contended there was "a lot of individual variation among putative class members with respect to how much time they logged as on-duty or off-duty."  *Id.*  This was because the plaintiffs intended to prove their theory with common evidence and the defendant's objections about variation "ignore[d] Plaintiffs' theory of the case, under which it simply does not matter whether a given class member was doing [a certain] type of work (or relaxation) for *x* number of hours or that type of work (or relaxation) for *y* number of hours during any given . . . period."  *Id.*  Here too, Plaintiffs' theory of the case is that "the driver's subjective reaction to the polic[ies]" does not matter, because the policies nevertheless exist and constrain the drivers such that they are entitled to compensation.  Tr. 37:11-39:3.  Just as *Browne* and several other courts have found, Plaintiffs' identification of common evidence of the policies' existence and common questions of law about whether those policies give rise to liability satisfies predominance.  *See, e.g.*, *Bouissey I*, 2022 WL 16957830, at *7-8 (evidence of common policies and questions about whether the policies restricted plaintiffs predominated over individual inquiries); *Ridgeway v. Wal-Mart Stores Inc.*, No. 08-cv-05221,

2014 WL 4477662, at *7-8 (N.D. Cal. Sept. 10, 2014) (rejecting defendant's argument that individualized issues about how class members spent their work day undermined predominance because defendant's policies raised common questions, including "whether drivers remained under Wal-Mart's control during layovers, rest breaks, and wait-times," that "predominate[d] over individual questions of . . . whether some drivers completed tasks like paperwork during wait-time or attended to personal phone calls during layovers"), *aff'd*, 946 F.3d 1066.  Whether Plaintiffs will ultimately prevail on their theory is another question.  *See Ayala*, 2017 WL 3328087, at *7-10 ("Because all sleeper berth time claims . . . turn on a single issue — whether [d]efendants exert 'control' over class members . . . by requiring them to secure their loads and respond to Drivertech messages — the Court would find that all of these claims are subject to common proof.  Defendants may challenge, and ultimately prevail on this crucial issue, but cannot do so at the certification stage." (footnote omitted)).

 *Tecocoatzi-Ortiz v. Just Salad LLC,* No. 18-cv-07342 (JGK), 2022 WL 596831 (S.D.N.Y. Feb. 25, 2022), and *Gil v. Pizzarotti, LLC*, No. 19-cv-03497 (MKV), 2022 WL 970514 (S.D.N.Y. Mar. 31, 2022), cited by Swift, are inapposite.  In *Tecocoatzi-Ortiz*, the plaintiffs' claims "r[ose] and f[ell] based on the particular working conditions experienced by each plaintiff" because there were not "any universally adopted and followed unlawful policies," and the court thus found that questions of fact would predominate.  2022 WL 596831, at *18-19.  Similarly, in *Gil*, the Court found that individualized issues would predominate because the evidence suggested that some class members were paid overtime while others were not, creating a "wide range of experiences."  2022 WL 970514, at *5.  Individualized proof of an employer/employee relationship was also a central issue in the case.  *Id.*  Here, by contrast, Plaintiffs' theory of liability depends on the existence of certain universal policies that applied to all putative class members who are concededly employees.

The individualized issues that defeated predominance in *Tecocoatzi-Ortiz* and *Gil* are not present here.

Finally, Swift's contention that the R&R "eschewed any balancing of the individualized issues," Obj. at 16, mischaracterizes the R&R. The R&R balanced the individualized issues against the common ones — it just did not reach the result that Swift would prefer. Magistrate Judge Aaron acknowledged that some individual evidence might be required to, for example, calculate the number of hours worked and damages, but found that the common legal issues of whether the policies alone gave rise to control and whether hours logged outside of New York could be counted for purposes of the NYLL were common issues that were "more significant and predominate[d] over issues subject to individual proof." R&R at 30. The Court agrees with Magistrate Judge Aaron's conclusion that the common issue of whether the policies themselves render sleeper berth or off duty time compensable is more significant than, and predominates over, issues subject to individual proof.

> 2. *Section 785.22*

Swift also asserts that the question of whether section 785.22 applies to members of the Proposed Subclasses is not subject to common proof and therefore predominance has not been established. Obj. at 17-18. Swift repeats its argument that its policies cannot demonstrate that the time spent in the sleeper berth is "hours worked" for purposes of section 785.22, which the Court has rejected. *See supra* at 23-25. Swift further argues that individual issues predominate because section 785.22 requires 24 hours of continuous on duty time and there are a variety of circumstances that could interrupt the continuity of on duty time. Obj. at 18. But the common question raised here is whether the uniform operational policies relied upon by Plaintiffs resulted in drivers remaining on duty for more than 24 hours, triggering section 785.22. *Petrone v. Werner Enterprises, Inc.*, 2017 WL 510884, cited by Swift,

underscores this. In *Petrone*, the court considered whether to decertify a class of truckers that similarly sought relief under section 785.22 based on the defendant's common practice and policy. *Id.* at *11-12. The court reasoned that even though section 785.22 required plaintiffs "to prove that the class was required to be continuously on-duty for 24-hour shifts, because the Plaintiffs attack a common policy, there is no indication that such proof would need to be individualized." *Id.* at *12. So too here. Plaintiffs may ultimately struggle to prevail at later stages of this litigation, but they still have identified common questions of law and fact that predominate over individualized ones.

### 3. Choice of Law

Swift next objects to the R&R's conclusion that choice of law issues did not defeat predominance, contending that Magistrate Judge Aaron improperly deferred the choice of law inquiry and that the inquiry will produce individualized inquiries that predominate over common issues. Obj. at 18-21. The Court does not agree that choice of law issues defeat predominance.

The Second Circuit has explained that "[c]ourts must exercise care in conducting a choice of law analysis in a putative Rule 23(b)(3) class action . . . in order to determine whether any conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through classwide proof." *Johnson*, 780 F.3d at 141. Thus, "[w]hen claims in a class action arise under state law — and the class comprises multiple states — the court must consider whether different state laws will apply to different members of the class." *Id.* at 140. The Court will examine each class to determine if choice of law issues defeat a predominance finding.

### i.    *Class A (and subclasses)*

Class A members are based in New York but seek to recover for time spent inside and outside of New York.  Choice of law considerations do not defeat predominance for Class A.  Resolving this issue requires the Court to determine whether the NYLL applies to the Class A members' hours outside New York.  Swift argues that being based in New York is not enough for the NYLL to apply, and that determining whether the NYLL applies will "bog this matter down with individualized issues," Obj. at 20, while Plaintiffs contend that the question can and should be resolved through common proof and legal analysis, Resp. at 19-20.  For the reasons that follow, the question of whether the NYLL applies to the time Class A drivers worked outside New York involves common questions of law and fact and does not defeat predominance.

Plaintiffs' claims for relief arise under New York state law.  In these circumstances, "a federal court generally must apply the choice-of-law principles of the state in which it sits," namely, New York law.  *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 146 (S.D.N.Y. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  New York courts have declined to adopt a brightline rule barring the extraterritorial application of the NYLL and instead apply New York choice of law rules to determine whether the NYLL should apply.  *See, e.g.*, *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002-03 (N.Y. 1994) (applying greater interest test to resolve whether NYLL or conflicting Massachusetts law applied); *Heng Guo Jin v. Han Sung Sikpoom Trading Corp.*, No. 13-cv-06789 (CBA) (LB), 2015 WL 5567073, at *9 (E.D.N.Y. Sept. 21, 2015) (recognizing approach in *Padula*); *Solouk*, 2019 WL 2181910, at *16 (same).[6]

---

[6] Swift also cites *O'Neill v. Mermaid Touring, Inc.*, 968 F. Supp. 2d 572 (S.D.N.Y. 2013), in support of the proposition that the NYLL can never apply extraterritorially.  That case is

New York courts apply the "greatest interest test" to determine whether the NYLL or a competing state's law applies. *Pierre v. Gts Holdings, Inc.*, No. 15-cv-00143 (PAC), 2015 WL 7736552, at *2-3 (S.D.N.Y. Nov. 30, 2015); *see Padula*, 644 N.E.2d at 1002-03 (applying greater interest test to resolve whether NYLL or conflicting Massachusetts law applied). The Court must examine whether New York, or another state, has the greatest interest with the specific issue raised in the litigation. "To do so, the Court considers the 'relationship or contact' of each state to the parties and to the underlying occurrence. 'Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.'" *Pierre*, 2015 WL 7736552, at *3 (citation omitted) (quoting *Schultz v. Boy Scouts of Am.*, 480 N.E.2d 679, 683-84 (N.Y. 1985)). "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws." *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996).

Here, the parties are domiciled in different states. Defendant Knight-Swift is a Delaware and Arizona citizen, and Defendant Swift Transportation Co. of Arizona is an Arizona citizen. SAC ¶¶ 25-26. Plaintiff Shaw, the named plaintiff for Class A who was based in the Johnstown Terminal, is a New York citizen. *Id.* ¶ 24. In assessing the locus of the tort for purposes of the NYLL, the court treats "the location of [Plaintiffs'] employment to be the relevant 'locus' here," since the object of the statutory claims is the "employment relationship" with Swift. *Pierre*, 2015 WL 7736552, at *3. This requires the Court to

---

distinguishable: as the court in *Heng Guo Jin* explained, that "case[] stand[s] only for the uncontroversial proposition that a state's labor laws do not reach work done entirely and exclusively outside that state." 2015 WL 5567073, at *9. Here, by contrast, the question is whether the NYLL embraces work done by a New York–based employee of a company that has significant operations in New York, who begins and ends his tours of duty in New York but may spend at least part of his workday transporting goods to out-of-state buyers. *See id.* (similar).

consider where the putative class members performed the labor that gives rise to the instant NYLL claims.  Swift argues that there is variability in the amount of time drivers log in New York, the greater-interest analysis would differ for drivers based on how much time they spent working in New York, and therefore individual issues predominate.  *See* Opp. at 23-24. However, all but three of the twenty-two drivers identified either by Swift or Plaintiffs spent more than 60 percent of their duty in New York; most spent well above 80 percent of their time in New York.  Piller Decl. ¶ 36.  Even if there are a few class members who did not work the majority of their time in New York, the other factors in the greater-interest test are susceptible to common proof and predominate over individualized issues.  For example, the Court must consider the other states' contacts and New York's comparative interest in regulating the conduct at issue.  These questions are capable of classwide resolution.  Class A drivers are based out of New York and New York has a significant "interest in protecting employees who live and work in New York [and] in applying its labor laws uniformly to employers who enjoy the many benefits of conducting substantial business in the state," *Pierre*, 2015 WL 7736552, at *4.  Further, the other states that Class A drivers drove through — such as Pennsylvania, Connecticut, Massachusetts, Vermont, New Hampshire, and Maine, *see* Dkt. 135-4 (Quast 30(b) Dep.) 35:15-36:12 — may have only a general interest in regulating workers who pass through the state on their way to and from New York and who are based in New York.  With respect to Swift's domicile, there is no indication that, aside from Arizona and Delaware's general interest in regulating companies headquartered or domiciled in their states, Arizona or Delaware has any specific interest in Swift's conduct with regard to these New York–based employees.  Thus, the Court is satisfied that resolving whether the NYLL applies to Class A can be done on a classwide basis.

### 4. Classes B and C (and subclasses)

Choice of law issues also do not defeat predominance for Classes B and C. Choice of law issues for Classes B and C can be resolved more simply because Plaintiffs seek only to recover for time worked in New York. Swift argues that Plaintiffs have not shown that the NYLL cannot apply in a "piecemeal" manner, toggling on and off based on where the drivers worked. Obj. at 19-20. But this is a common legal question and indeed courts in this Circuit have permitted plaintiffs to recover under the NYLL for time worked in New York, even where they performed the majority of their work out of state. *See, e.g.*, *Drozd v. U.S.A. Concepts of N.Y. Corp.*, No. 09-cv-05120 (RER), 2015 WL 13733713, at *11-12 (E.D.N.Y. Apr. 23, 2015) (plaintiff who "worked primarily in New Jersey" for 28 weeks, except for "the ten days he worked in Manhattan," could recover "unpaid overtime wages under the NYLL for the time he worked in Manhattan"); *O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 575, 579 (S.D.N.Y. 2013) (plaintiff based in Los Angeles who worked in New York could recover under the NYLL for hours worked in New York). The Court finds that these choice of law issues can be resolved through a common legal analysis and will not involve consideration of individualized evidence. Thus, the R&R correctly found that individualized choice of law issues would not predominate.[7]

---

[7] Individualized determinations about the amount of time Class B and C members spend in New York do not defeat predominance even if they are relevant to damages. *See Lassen v. Hoyt Livery Inc.*, No. 13-cv-01529, 2014 WL 4638860, at *12 (D. Conn. 2014) ("Once it is determined . . . how to calculate the hours for which a driver should have been compensated, damages for each driver will be a mere question of 'arithmetical calculations based on . . . records and other documentary evidence.'" (second omission in original) (quoting *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 369 (S.D.N.Y. 2014))); *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 345 (S.D.N.Y. 2004) (finding predominance requirement satisfied even though "determinations as to damages . . . w[ould] require individualized findings").

**B.  Superiority**

Swift finally argues that the R&R incorrectly concluded that superiority was met.  Obj.

at 21-22  The Court does not agree.

To certify a Rule 23(b)(3) class, the court must also "determin[e] that class

certification is the superior method for adjudicating [the class's] claims."  *Sykes*, 780 F.3d at

82.  Rule 23(b)(3) "lists four factors — individual control of litigation, prior actions involving

the parties, the desirability of the forum, and manageability — which courts should consider

in" determining whether to certify a class.  *Id.* (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).  The

Second Circuit has explained that while these factors "apply to both predominance and

superiority, they more clearly implicate the superiority inquiry."  *Id.*

Magistrate Judge Aaron correctly concluded that Plaintiffs met superiority.  He

considered the four Rule 23(b)(3) factors and reasoned a class action was superior to

individual litigation because individual class members in wage-and-hour actions are unlikely

to engage in individual action, and that no party was aware of an analogous class under New

York law.  R&R at 32.  He had already found that choice of law issues did not counsel against

certifying the classes, *see id.* at 11, 26-27, and that it would be desirable to concentrate the

litigation in this forum because the claims were brought under New York law and no

manageability issues defeated superiority, *id.* at 32.

Swift's contention that the R&R inadequately analyzed manageability misses the

mark.  Swift (1) argues that Plaintiffs did not address manageability and therefore did not

meet their burden; (2) reiterates that individualized issues, including choice of law, undermine

manageability; and (3) objects to the brevity of the R&R's discussion of manageability.  Obj.

at 21-22.  Manageability is "the most critical concern" in determining superiority, and

involves consideration of such factors as whether "a particular forum is more geographically

convenient for the parties," whether "the defendant is located in the forum state," *Sykes*, 780

F.3d at 82 (quoting 2 William B. Rubenstein, *Newberg on Class Actions* §§ 4.71-4.72 (5th ed.

2014)), and whether the "proposed classes would implicate the laws of multiple states," *In re

Digit. Music Antitrust Litig.*, 321 F.R.D. at 99.  While Swift asserts that Plaintiffs did not

address manageability, the Court's review of Plaintiffs' motion papers and the oral argument

transcript indicates otherwise.  *See* Br. at 24-25; Tr. 113:24-114:24.  As Plaintiffs noted in

their class certification brief, there is no question that the forum is geographically convenient

for all parties, since Swift operates several terminals in New York state and the class members

are based in and around New York.  While some Class B and C members may live outside of

New York, the forum is geographically convenient for the named plaintiffs, who live in New

York or in Pennsylvania.  Concentrating litigation in this forum "is [also] desirable because

the Court is familiar with the history of this case, having ruled on earlier motions."  *Pub.

Emps.' Ret. Sys. of Miss.*, 280 F.R.D. 130, 141 (S.D.N.Y. 2012).  Moreover, this forum is a

desirable one due to the Court's familiarity with the NYLL and New York choice of law rules.

*Cf. id.* (finding that the familiarity of the Southern District of New York with securities law

weighed in favor of concentrating class litigation in this district).  While Swift argues that

individualized issues, including choice of law, would undermine manageability, these

"concerns about manageability 'rely, almost entirely, on a premise the Court has already

rejected — namely, that innumerable individualized inquiries will swallow common ones.'"

*Newman v. Bayer Corp.*, 348 F.R.D. 567, 585 (S.D.N.Y. 2025) (quoting *In re Scotts EZ Seed

Litig.*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015)).  Finally, the fact that the R&R addressed

manageability only briefly reflects that the manageability concerns are minimal, not that there

was error in the R&R, particularly in light of the array of tools the Court has to manage the

litigation effectively.  *See, e.g.*, *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 373

(S.D.N.Y. 2007) (addressing manageability by briefly noting that the court did "not foresee any particular difficulties to be encountered in the management of the class action and [was] confident that any such concerns [could] be addressed by counsel and the court if and when they arise"); *Alfonso*, 2024 WL 1007220, at *15 (resolving manageability by explaining that "[d]efendant's contentions regarding inferiority of a class action largely go to manageability concerns which, while relevant, can be ameliorated by the district court's authority to manage the litigation effectively").[8]

In light of the foregoing, the Court concludes that Magistrate Judge Aaron properly found superiority satisfied.

## III.    Class Counsel

The R&R recommended that Plaintiffs' counsel, Schneider Wallace Cottrell Konecky LLP, be appointed class counsel.  R&R at 33.  Neither party objects to this recommendation and the Court thus reviews it for clear error.

Rule 23 requires the Court to appoint class counsel at the time of class certification. Fed. R. Civ. P. 23(g)(1).  In appointing class counsel, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that

---

[8] Swift briefly asserts that superiority is undermined by the fact that some Class B and C members live outside New York state, "rendering it a problematic venue."  Obj. at 21 n.11. However, the Court does not agree, and Swift has not cited any authority suggesting, that venue here is improper because some unnamed class members live outside New York, or that superiority would be compromised as a result.  *Cf. In re Actos Antitrust Litig.*, No. 13-cv-09244 (RA) (SDA), 2024 WL 4251891, at *14 (S.D.N.Y. Aug. 9, 2024) (noting that "absent class members are not considered parties for assessing diversity of citizenship or in determining proper venue"), *report and recommendation adopted*, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024).

counsel will commit to representing the class," *id.* 23(g)(1)(A), as well as "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," *id.* 23(g)(1)(B).

Having reviewed Schneider Wallace Cottrell Konecky LLP's submissions, the Court is satisfied that Schneider Wallace Cottrell Konecky LLP should be appointed class counsel. They have invested significant time and resources into this litigation, worked closely with the named Plaintiffs, have significant experience litigating class certification motions, wage and hour class and collective actions in the transportation and delivery industry, and have brought similar class and collective actions on behalf of truck drivers against their employers. *See* Piller Decl. ¶¶ 2-12. As the R&R noted, "[t]heir conduct of this litigation to date reveals their knowledge of the law and the resources they have committed to representing the class." R&R at 33. Therefore, the Court appoints Schneider Wallace Cottrell Konecky LLP as Class Counsel.

## CONCLUSION

For the foregoing reasons, the Court adopts the R&R. The Court grants Plaintiffs' motion to certify the Proposed Classes and Subclasses, and will further certify the HVL Subclass for Class A. Finally, the Court will certify HVL Subclasses for Classes B and C subject to a further submission respecting numerosity of those subclasses, as recommended by the R&R. Plaintiff Hobbs, Shaw, and Bell are appointed class representatives, and Schneider Wallace Cottrell Konecky LLP is appointed Class Counsel.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 125.

Dated: June 4, 2025
New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge